PETER MARK JONES vs. MICHAEL TAIBBI & others.[1]

Norfolk. May 5, 1987. — August 18, 1987.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, & LYNCH, JJ.

*Libel and Slander. Privacy.*

The repetition by a television news reporter and subsequently by two broadcasting companies of untrue allegations that a plaintiff was implicated in a series of notorious murders was defamatory as a matter of law. [791-792]

On a claim alleging that several television news broadcasts were false and defamatory on the ground that a reporter made certain untrue assertions of fact, the judge correctly granted summary judgment for the defendants where the statements in issue were, variously, privileged; true; or not defamatory as matter of law; or where the plaintiff had not established the necessary degree of fault on the part of the defendants for liability to attach. [792-794]

The plaintiff in a civil action could not maintain a claim for defamation on the theory that certain news broadcasts by a television station were "indorsements" of the false allegations reported, where the broadcasts were not susceptible of such an interpretation. [794]

Truth was not a defense to a claim of defamation where the television news reports broadcast about the plaintiff, which consisted in part of accounts of defamatory statements or actions attributed to a third party, were not substantially true. [794]

On a plaintiff's claim alleging he was defamed by a television news broadcast, summary judgment was properly ordered for the defendants, where the privileged report that the plaintiff had been arrested did not become substantially inaccurate because the report also incorrectly stated that the plaintiff had been charged with murder. [794-796]

On a defamation claim, summary judgment was improperly entered for the defendants where the allegedly defamatory unofficial statements of police sources reported by the defendants in a television broadcast were outside the scope of the common law fair report privilege as set forth in Restatement (Second) of Torts § 611, upon which the defendants were otherwise entitled to rely. [796-797] ABRAMS, J., concurring.

The plaintiff in a defamation action was not a limited issue public figure by reason of his being arrested for, but not charged with, a series of

---

[1] Boston Broadcasters, Inc. (WCVB-TV Channel 5) and American Broadcasting Companies, Inc.

notorious murders, where he had not "voluntarily thrust" or "injected" himself into the controversy but, rather, had been "dragged unwillingly" into the investigation [797-799]; nor was he an involuntary limited purpose public figure as that is described in *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 345 (1974) [799].

On claims against a reporter and a television broadcast company for publishing untrue allegations made by a prison inmate that the plaintiff was implicated in a series of notorious murders, the judge incorrectly granted summary judgment in favor of the defendants where the materials before him revealed genuine issues of material fact as to the requisite elements for a jury finding that the defendants knew the falsity, or should have had reasonable doubt before publication as to the truth, of those allegations as well as statements of members of the inmate's family to the effect that he was telling the truth. [799-800] ABRAMS, J., concurring.

On a defamation claim, summary judgment was properly granted for the defendants where the record supported the accuracy of statements they had published, where nothing in the record indicated that the sources of the statements were unreliable and where no evidence of negligent conduct on the part of the defendants appeared. [800]

A plaintiff's contention in his claim for damages for invasion of privacy that his arrest was a private fact that the defendant unreasonably published was without merit [801]; and summary judgment was properly granted in favor of the defendants on his claim that the television broadcast of his arrest cast him in a false light and constituted an invasion of privacy, where the impression given by the broadcast was not false or the portrayal distorted or offensive [801-802].

CIVIL ACTION commenced in the Superior Court Department on March 23, 1979.

The case was heard by *George N. Hurd, Jr.*, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Martin C. Gideonse* for the plaintiff.

*John Taylor Williams* for Michael Taibbi & another.

*Michael J. Liston* for American Broadcasting Companies, Inc.

LYNCH, J. On March 30, 1978, the plaintiff, Peter Mark Jones, was taken into custody and detained in California by the Los Angeles police department (LAPD) as a suspect in a chain of notorious murders known as the Hillside stranglings.

Between March 30, 1978, and April 3, 1978, the defendant Boston Broadcasters, Inc. (WCVB-TV Channel 5), broadcast a series of news reports about Jones's arrest.[2] The background investigation for the reports was prepared by defendant Michael Taibbi. The plaintiff was later released when police failed to charge him formally with the crimes. This action, initiated by Jones in 1979, alleges invasion of privacy and defamation as a result of those news broadcasts.[3] A judge in the Superior Court granted the defendants' motions for summary judgment. We transferred the case to this court on our own motion. We affirm in part, reverse in part, and remand the case to the trial court for further proceedings.

In 1977 and early 1978, Los Angeles was the scene of a series of murders of young women which became known as the "Hillside stranglings." In February, 1978, Taibbi, then an investigative reporter for Channel 5, learned from a Massachusetts prison guard that one George Shamshak, an inmate at the Massachusetts Correctional Institution at Walpole (now Cedar Junction), had information about the "Hillside strangler." Shamshak alleged that the plaintiff, then working in the Los Angeles area, had committed two or three of the Hillside murders. Shamshak indicated that the murders had occurred while he was staying with the plaintiff in California after an escape from M.C.I., Walpole. Massachusetts State police Detective

_____

[2] Under California law, when a person is taken into police custody without a warrant and later released with no formal charges listed against him, "[t]hereafter, such arrest shall not be deemed an arrest, but a detention only." Cal. Penal Code § 849(c) (Deering 1985). However, in his complaint, answers to interrogatories, and in his brief to this court, the plaintiff categorizes his detention as an arrest.

[3] The original complaint, which was brought against several additional defendants, including another journalist and a State police officer, sought damages for alleged violations of Jones's right to privacy and his civil rights, for defamation and for false imprisonment. The case was removed to the United States District Court, which dismissed the Federal civil rights claim. *Jones* v. *Taibbi*, 508 F. Supp. 1069 (D. Mass. 1981). The plaintiff thereupon dismissed or dropped the claims against the other defendants. An amended complaint was subsequently filed in the Superior Court against Taibbi, Channel 5, and the American Broadcasting Companies, Inc.

William Bergin obtained similar information concerning Shamshak, and proceeded to investigate.

In early March, 1978, Taibbi learned from Bergin that two LAPD detectives had come to Massachusetts to question Shamshak. Bergin informed Taibbi that Shamshak, describing Jones as a "lifelong" or "boyhood" friend, had implicated Jones in two or three of the murders and that polygraph tests appeared to confirm his story. Shamshak had also identified photographs of the victims from a photographic array, and Bergin had no doubts about his veracity. Taibbi contacted the LAPD about its investigation and agreed to refrain from publicizing the information about Jones in return for being given advance knowledge of and permission to film Jones's arrest, if made. James Mitchell, a Los Angeles reporter, received similar information from the LAPD and also reached an agreement concerning the reporting of Jones's possible arrest.

In March, 1978, Shamshak was transferred from Massachusetts to California, and the LAPD placed Jones under surveillance. Throughout this period, as it sought corroborating evidence, the LAPD did not express doubt about Shamshak's story. Shamshak had passed several polygraph tests and possessed detailed knowledge of some of the murders which was not known by the public.

In late March, Taibbi and a Channel 5 cameraman traveled to California to film a series of reports on the investigation and possible arrest of Jones. On March 30, 1978, the LAPD arrested Jones in a parking lot. Taibbi and Mitchell were present and Channel 5 filmed the arrest from a parking lot accessible to the public. News of the arrest was broadcast almost immediately by other members of the news media. The LAPD held a press conference and termed the arrest of Jones a "major break." Jones was booked and held as a suspect in the Hillside stranglings, but was never formally charged.

Channel 5 announced the break in the Hillside case during its 11 P.M. newscast on March 30, 1978. The newscast included a background report by Taibbi. Taibbi described Shamshak's allegations that he had seen Jones murder at least two, and perhaps three, young women in the back of a van. Taibbi

reported that the results of four polygraph tests supported Sham-shak's allegations, and noted that the Massachusetts police believed that Shamshak's story "held." State police Lieutenant Colonel John Donovan was interviewed by Taibbi about the investigation.[4] The report also included interviews with members of Shamshak's family, who stated that they believed Shamshak. On the other hand, the report included Donovan's statement that California authorities had yet to find corroborative evidence. Taibbi concluded by posing several "unanswered questions" which cast doubt on Shamshak's credibility. Taibbi questioned, for example, whether Shamshak was a participant in the murders rather than an "innocent witness," and noted that, while Shamshak knew "much, much more than he could have learned from news accounts of the killings, . . . often, on crucial points, he's been way off the mark."

During the next few days, Channel 5 reported on developments in California and in Massachusetts. The March 31, 6 P.M. newscast included a segment by Taibbi which included a film of Jones's arrest and reported that Jones had been booked on suspicion of murder on the basis of Shamshak's information. Taibbi described the LAPD surveillance of Jones, and quoted a source who said Jones was "the kind of man who dropped coins in blind mens' [*sic*] cups and who stopped to help stranded motorists on the highways." An interview with Los Angeles Police Chief Daryl Gates was shown in which Gates stated there was "absolutely no question" that Shamshak's information was "the best thing we've had to go on."[5] The newscaster stated that "Los Angeles police charged Jones with two counts of first degree murder." The newscast then repeated Taibbi's March 30 background report and continued with a report quoting Jones's former fiancée saying that Jones could not be connected with the murders. There was also a segment reporting

---

[4] The plaintiff does not raise any issue as to these statements on appeal, and, therefore, we need not consider them.

[5] The plaintiff does not contend that the statements by Gates are defamatory, and therefore we do not consider them. The plaintiff does argue, however, that the questions by Taibbi during the course of the interview indorse Shamshak's allegations.

on a news conference held by the Massachusetts State police, in which Detective Bergin explained the State police role in the investigation.

Subsequent newscasts repeated some of these reports, as well as ongoing official investigations in Maine and Massachusetts into possible connections between the stranglings and similar murders in those States. Beginning on April 1, 1978, at 6 P.M., Channel 5 reported that the LAPD had not corroborated Shamshak's allegations. The newscaster stated that there was not "enough evidence yet to file murder charges against Jones," and, on the 11 P.M. newscast, it was reported that "Police in Los Angeles are still trying to find some hard evidence to justify a murder charge." On April 3, Channel 5 reported that Jones had been released "because of a lack of evidence." Taibbi reported that the LAPD investigation of Jones was not over, but that "Jones had a solid alibi for one of the nights in question," and was not at the moment a suspect in the killings. Two later newscasts reported the fact that Jones had been released.

The defendant American Broadcasting Companies, Inc. (ABC), reported Jones's arrest in its March 31, "Good Morning America" and "ABC Evening News" programs. At least one news segment on the "Good Morning America" program included the Channel 5 film of Jones's arrest with Taibbi's voice-over commentary. Additional reporting was done by several ABC correspondents, who used portions of Channel 5 film in their reports.

I. *Defamation.*

1. *Defamatory publication.* The threshold issue we confront is whether the broadcasts in question are "'reasonably susceptible of a defamatory connotation,' so as to warrant their submission to a jury to determine if in fact the defamatory connotation was conveyed." *Cianci* v. *New Times Publishing Co.*, 639 F.2d 54, 60 (2d Cir. 1980), quoting *James* v. *Gannett Co.*, 40 N.Y. 2d 415, 419 (1976). *Bufalino* v. *Associated Press*, 692 F.2d 266, 269 (2d Cir. 1982), cert. denied, 462 U.S. 1111 (1983). *Lal* v. *CBS, Inc.*, 551 F. Supp. 356, 360 (E.D. Penn. 1982), aff'd, 726 F.2d 97 (3d Cir. 1984). Restate-

ment (Second) of Torts § 614 (1977). The determination whether the communication complained of is capable of a defamatory meaning is for the court. Restatement (Second) of Torts, *supra* at § 614 comment b. Where the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury. *Id.* See *Smith* v. *Suburban Restaurants, Inc.*, 374 Mass. 528, 530 (1978).

The plaintiff argues that the repetition of Shamshak's allegations was false and defamatory. An imputation of crime is defamatory per se. *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975). *Lynch* v. *Lyons*, 303 Mass. 116, 118-119 (1939). Absent a privilege, "the republisher of a defamatory statement 'is subject to liability as if he had originally published it.' " *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. 32, 36 (1985), quoting Restatement (Second) of Torts § 578 (1977). See generally W. Prosser & W. Keeton, Torts § 112, at 789 (5th ed. 1984); R. Sack, Libel, Slander, and Related Problems § II.6.1. (1980); L. Eldredge, Defamation § 44*a* at 232 (1978). Liability for a defamatory statement may not be avoided "merely [by] adding a truthful preface that someone else has so stated." *Ricci* v. *Venture Magazine, Inc.*, 574 F. Supp. 1563, 1572 (D. Mass. 1983). See *Maloof* v. *Post Publishing Co.*, 306 Mass. 279, 280 (1940). The defendants do not contend that Jones committed the murders to which Shamshak referred. Thus, the defendants' repetition of Shamshak's accusations, not shown to be true, was defamatory as a matter of law.

The plaintiff also argues that the broadcasts in question were false and defamatory independently of Shamshak's accusations.[6] The plaintiff's claims can be separated into two categories: (1) that Taibbi and Channel 5 made untrue assertions of fact during the broadcasts,[7] and (2) used certain cinematic

---

[6] We address the plaintiff's additional argument, that the broadcasts of the "actual detention" were defamatory, in our discussion of the fair reporting privilege asserted by the defendants.

[7] In his complaint, Jones identifies four allegedly untrue statements of fact: (1) that "police charged Jones with two counts of first degree murder"; (2) that Shamshak had submitted to four polygraph tests; (3) that Jones was

techniques or made editorial decisions which either implied the probable guilt of Jones, or indorsed, espoused, or otherwise concurred in Shamshak's accusations against Jones.[8]

a. *Untrue assertions of fact.* As a basis for his claim, the plaintiff first relies on a statement that he had been charged with two counts of murder.[9] We conclude below that this statement is privileged. See *Williams* v. *WCAU-TV*, 555 F. Supp. 198 (E.D. Pa. 1983). The plaintiff also bases his claim on the contention that the report falsely stated that Shamshak had passed four separate polygraph tests. We conclude, however, that the statement was essentially true. See *infra* at 800. Finally, the plaintiff argues that the description of him as Shamshak's "lifelong" or "boyhood" friend was false and defamatory.[10] The description of someone as a friend (or even relative) of a criminal ordinarily is not in itself defamatory. See *Bufalino* v. *Associated Press, supra* (statement that one has a family relationship with mafia not ordinarily actionable). Even if we assume, however, that the statement was susceptible of a defamatory meaning, we conclude that the defendant has failed to establish the requisite degree of fault necessary to impose liability for that statement. *Infra* at 800.

The plaintiff also refers to statements made by Bergin during the course of a news conference. The statements by Bergin do

---

the "lifelong friend" of George Shamshak; and (4) that Jones was "arrested" rather than involuntarily detained. We need address only the first three assertions. The contention that Jones was not "arrested" is contradicted by Jones himself. He characterizes the event as an arrest in his answers to interrogatories and brief to this court. Moreover, this claim is not specified in his complaint.

[8] Jones's chronicle of editorial techniques and cinematic manipulation includes: (1) the "appeal to the authority of an 'insider'"; (2) the implied "motive for urgency"; (3) the contextual diminution of exculpatory information; (4) the use of "close juxtaposition"; (5) the use of "conscious artifice"; (6) the use of "cinema verité" techniques; (7) the use of "ellipsis"; (8) the use of "ironic contrast"; and (9) the excising of "highly relevant material."

[9] On March 31, 1978, at 6 P.M., the Channel 5 newscaster reported that "[t]his morning, Los Angeles police charged Jones with two counts of first degree murder."

[10] In his affidavit, the plaintiff asserts that he was unaware of Shamshak's existence until the fall of 1977.

not imply anything about the plaintiff or the veracity of Shamshak's allegations, and we conclude that they cannot be considered defamatory as a matter of law.

b. *Indorsement of Shamshak's charges.* With respect to the plaintiff's "indorsement" theory, we conclude that the broadcasts are not susceptible of the interpretation placed upon them by the plaintiff.

c. *Truth as a defense.* The defendants argue that the broadcasts were substantially true and accurate accounts of the plaintiff's arrest and detention within the context of an arrest and investigation by Massachusetts State police officials and the LAPD. However, the defendants cannot escape liability merely by attributing defamatory statements or actions to a third party. It is the truth of the underlying defamation that must be shown in order to establish the defense of truth. *Lal* v. *CBS, Inc., supra.* See *Maloof* v. *Post Publishing Co., supra.* Eldredge, *supra* at § 67. Since the defendants do not contend that the plaintiff committed the multiple murders as alleged by Shamshak, the reports cannot be considered substantially true. See *Lal* v. *CBS, Inc., supra* at 361. *Rouch* v. *Enquirer & News,* 137 Mich. App. 39, 43 n.2 (1984), aff'd, 427 Mich. 157 (1986).

2. *Privilege.* There are, however, various recognized privileges permitting the publication of fair reports of certain proceedings even when the accounts contain defamatory statements. *Medico* v. *Time, Inc.,* 643 F.2d 134, 137 (3d Cir.), cert. denied, 454 U.S. 836 (1981). There is a well established privilege to publish reports of judicial, legislative, or other official proceedings. See *Cowley* v. *Pulsifer,* 137 Mass. 392, 393-394 (1884); *Barrows* v. *Bell,* 7 Gray 301, 311-312 (1856); *Coffin* v. *Coffin,* 4 Mass. 1, 32-33 (1808). See generally S. Metcalf, Rights and Liabilities of Publishers, Broadcasters and Reporters § 1.78 (1986), and cases cited therein. The common law fair report privilege is embodied in the Restatement (Second) of Torts § 611 (1977).[11] The defendants argue that, even

[11] Section 611 provides: "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the

if the broadcasts in question are not substantially true, they are protected under this privilege.

As that privilege is commonly applied, it clearly affords protection to the defendants against one of the plaintiff's claims. For example, "[t]he publication of the fact that one has been arrested, and upon what accusation, is not actionable, if true." *Thompson* v. *Globe Newspaper Co.*, 279 Mass. 176, 188 (1932), quoting *Commercial Publishing Co.* v. *Smith*, 149 F. 704, 706 (6th Cir. 1907). The reporting and broadcast of the plaintiff's arrest is therefore clearly privileged. The newscaster's statement that the plaintiff had been charged with murder is not so clearly protected. The United States District Court for the Eastern District of Pennsylvania has applied the privilege in a case similar to the facts of the instant case. *Williams* v. *WCAU-TV, supra* at 203-204. During a news report of a bank robbery, the plaintiff in *Williams* was filmed while under arrest, in handcuffs, being led by police officers to a police van. The audio portion of the broadcast stated that another suspect had earlier been taken into custody, and that both men "[would] be charged with the bank robbery." *Id.* at 203. The plaintiff was released shortly after his arrest and never was charged with the robbery. The court, however, concluded that the report was not rendered substantially inaccurate by the inclusion of the statement which, together with the accompanying film, implied that the plaintiff would be charged with the bank robbery, and held the broadcast to be privileged as a substantially accurate report of the plaintiff's arrest. *Id.* at 204. We conclude that similar reasoning applies here, and that the report of the plaintiff's arrest did not become substantially inaccurate merely because the report incorrectly stated that the plaintiff had been charged with murder. Over the course of several days of reporting the plaintiff's arrest, only once was it incorrectly reported that the plaintiff had been charged with a crime, and Taibbi's reports provided an accurate account of the plaintiff's status at all times. Although the plaintiff was not actually charged, the impact of that statement did not create a substantially greater

report is accurate and complete or a fair abridgement of the occurrence reported."

defamatory sting than an accurate report that the plaintiff had only been booked on suspicion of murder.

We consider the remaining portions of the broadcast which form the basis of the plaintiff's defamation claim to determine whether they fall within the ambit of the official proceedings privilege.

In its discussion of this privilege, the Restatement explains that: "An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. On the other hand statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section." Restatement (Second) of Torts § 611 comment h (1977). Accordingly, "[t]here is also no privilege to report the unofficial talk of such officials as policemen, as distinct from their official utterances or acts, such as an arrest" (footnotes omitted). W. Prosser & W. Keeton, *supra* at 836. *Phillips* v. *Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C. 1980) (reliance on unofficial police "hot line" not privileged).

We conclude that unofficial statements made by police sources are outside the scope of the fair report privilege. See *id.*; *Bufalino* v. *Associated Press*, 692 F.2d 266, 272 (2d Cir. 1982) ("Only reports of *official* statements or records made or released by a public agency are protected by the § 611 privilege" [emphasis in original]). Cf. *Patterson* v. *Tribune Co.*, 3 Fla. Supp. 2d 107 (Fla. Cir. Ct. 1983), appeal dismissed, 446 So.2d 111 (Fla. Dist. Ct. App. 1984) (newspaper report on complaint filed with sheriff's office, based on information supplied by that office at an official briefing, was privileged); *Sbarbati* v. *New York Post*, 10 Media L. Rep. (BNA) 2190 (N.Y. Sup. Ct. 1984) (press conference by district attorney announcing a criminal investigation); *Steer* v. *Lexleon, Inc.*, 58 Md. App. 199 (1984) (publication of erroneous police department press release of arrest). Cf. *Molnar* v. *Star-Ledger*,

193 N.J. Super. 12, 15-16, 21 (1984) (publication of erroneous information from deputy fire chief that plaintiff landlord had refused to take a lie detector test regarding fire at his property is protected by qualified privilege to report statements made by a public official with respect to matters within the scope of his official responsibilities); *Ingenere* v. *ABC*, 11 Media L. Rep. (BNA) 1227 (D. Mass. 1984) (television broadcast privileged when it relied upon investigative memoranda and letters from the General Services Administration which were not available to the public). Thus, the statements of Shamshak's mother and sister were not privileged and must be considered under the standards discussed below.

With respect to Taibbi's republication of Shamshak's allegations, it appears from an Associated Press report contained in the record, that at a press conference held by the LAPD after the arrest of Jones, Los Angeles Police Chief Gates outlined the substance of Shamshak's allegations against Jones. Therefore, the defendants may be entitled to rely on Gates's description of Shamshak's allegations as privileged. Should it be demonstrated that Shamshak's allegations were made public as part of an official statement by the LAPD, the defendants would be privileged to report that statement.

3. *Standard of liability*. In order to impose liability for the publication of unprivileged, false, and defamatory statements, the plaintiff must demonstrate some degree of fault on the part of the publisher. *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 347 (1974). Public officials and public figures may recover for publication of a defamatory falsehood upon proof of actual malice. *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 283 (1964). With respect to private persons, however, liability may be imposed upon proof of negligent publication of a defamatory falsehood. *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 858 (1975). In all cases, a "plaintiff's recovery is limited to actual damages which are compensatory for the wrong done by the defendant." *Id.* at 860.

The defendants argue that the plaintiff's status is that of a limited issue public figure, and, therefore, that he must meet

the actual malice standard. The Court in *Gertz* identified a
limited issue public figure as one who "voluntarily injects
himself or is drawn into a particular public controversy and
thereby becomes a public figure for a limited range of issues,"
and consequently has achieved "special prominence in the res-
olution of public questions." *Gertz* v. *Robert Welch, Inc.,
supra* at 351. In determining the plaintiff's status as a limited
issue public figure, this court must look "to the nature and
extent of an individual's participation in the particular con-
troversy giving rise to the defamation." *Id.* at 352. See *Hutch-
inson* v. *Proxmire,* 443 U.S. 111, 134-136 (1979); *Wolston*
v. *Reader's Digest Ass'n,* 443 U.S. 157, 166-169 (1979).

Even if we assume that the serial murders which lead to the
plaintiff's arrest constitute a "public controversy," see *Schultz*
v. *Reader's Digest Ass'n,* 468 F. Supp. 551, 558 (E.D. Mich.
1979) (disappearance of James R. Hoffa recognized as public
controversy), "[a] private individual is not automatically trans-
formed into a public figure just by becoming involved in or
associated with a matter that attracts public attention." *Wolston*
v. *Reader's Digest Ass'n, supra* at 167. S. Metcalf, Rights
and Liabilities of Publishers, Broadcasters and Reporters,
§ 162 (1986).

The United States Supreme Court's analysis of a plaintiff's
limited public figure status in *Wolston* v. *Reader's Digest
Ass'n, supra,* is instructive. In *Wolston,* the Court was required
to determine whether the plaintiff, the nephew of admitted
Soviet spies, became a limited purpose public figure by virtue
of his failure to appear during a 1957-1958 grand jury investi-
gation of Soviet intelligence activities in the United States,
and his subsequent citation for contempt. The Court found that
the plaintiff had neither "voluntarily thrust" nor "injected" him-
self into any public controversy, but rather had been "dragged
unwillingly" into the investigation, and that he played "only
a minor role" and "limited his involvement to that necessary
to defend himself against the contempt charge"; and concluded
that he was not a "limited-purpose public figure" within the
meaning of *Gertz. Wolston* v. *Reader's Digest Ass'n, supra*
at 161, 166-167. Here, it is fair to conclude that the plaintiff

was "dragged unwillingly" into the investigation of the Hillside stranglings, rather than having "voluntarily thrust" or "injected" himself into the proceedings. *Wolston, supra* at 166. Therefore, we perceive no conduct on the part of the plaintiff which would cause him to be considered a limited-purpose public figure.

The defendants argue that the plaintiff became an involuntary public figure. "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Gertz* v. *Robert Welch, Inc., supra* at 345. Wolston, *supra* at 166, and *Hutchinson* v. *Proxmire, supra* at 135, emphasize that a significant aspect in the determination of a plaintiff's public figure status is the plaintiff's voluntary participation in a particular controversy. The United States Court of Appeals for the District of Columbia Circuit recently has reiterated the Supreme Court's recognition in *Gertz* that involuntary public figures will be "few and far between." *Dameron* v. *Washington Magazine, Inc.*, 779 F.2d 736, 743 (D.C. Cir. 1985), cert. denied, 476 U.S. 1141 (1986). Although the *Dameron* court held the plaintiff to be an involuntary, limited purpose public figure, *id.* at 741, the nature of the plaintiff's public sector employment, which caused him to be a primary actor in a matter of public concern, was a determining factor. We conclude that, on the facts of this case, *Gertz* and its progeny compel a conclusion that the plaintiff is not a public figure, and thus retains his status as a private person.

Given our conclusion that the plaintiff is a private person for the purposes of this action, he need prove only the negligent publication of a defamatory falsehood to recover from the defendants for actual damages. *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. at 858. "Under the negligence standard adopted in *Stone* v. *Essex County Newspapers, Inc., supra*, the defendants are required to act 'reasonably in checking on the truth or falsity . . . of the communication before publishing it.'" *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. at 36, quoting Restatement (Second) of Torts § 580B comment g (1977).

Applying this standard to the conduct of Channel 5 and Taibbi, we conclude that a jury could find that Channel 5 and

Taibbi acted negligently in publishing their reports of Shamshak's allegations. Cf. *King* v. *Globe Newspaper Co., ante* 705, 709 (1987) (where reporter "had obvious reasons to doubt the veracity and accuracy" not of source, but of source's undisclosed informant, evidence would warrant jury finding of actual malice). Sufficient facts existed to permit the jury to find that the defendants had or should have had reasonable doubt as to the truth of Shamshak's allegations. For example, Taibbi was aware, from information obtained from a former Boston police officer, that Shamshak had not proved to be a reliable informant in the past. More importantly, Taibbi himself recognized certain inconsistencies in Shamshak's story, reporting that "often, on crucial points, he's been way off the mark." Therefore, if it is determined that the republication of Shamshak's allegations was not privileged, it is for the jury to determine whether Taibbi's decision to broadcast the allegation that Shamshak had seen Jones murder at least two, and perhaps three, women in the back of a van, was reasonable under the circumstances. The same determination must also be applied to the comments of the members of Shamshak's family concerning the veracity of Shamshak's story.

However, concerning the statements that Shamshak had passed four separate polygraph tests and that Shamshak was a "boyhood pal" of the plaintiff, we conclude that summary judgment was correctly granted. Although the Massachusetts State police officer who interviewed Shamshak and procured the polygraph tests stated in his affidavit that Shamshak had passed two *sets* of polygraph tests, the record makes clear that at least one set comprised "four different tests," and we conclude that the report was not inaccurate as a matter of law. It is also true that Shamshak and the plaintiff were acquainted for some indefinite time, and it is doubtful that liability would arise merely from the characterization of the relationship complained of by the plaintiff. In addition, there is nothing in the record to indicate that the sources of these statements were unreliable, and, as to these statements, we perceive no evidence of conduct on the part of the defendants which could be considered negligent.

II. *Invasion of Privacy.*

The plaintiff's remaining claim against Taibbi and Channel 5, and his sole claim against ABC, is for invasion of his "right against unreasonable, substantial or serious interference with his privacy." G. L. c. 214, § 1B.

The plaintiff asserts that the ABC reports of his arrest invaded his privacy in two respects. He claims that the film of his arrest (1) "gave unreasonable publicity to a private fact," and (2) "conveyed the false light impression that sufficient credible evidence inculpating Jones, amounting to probable cause, existed to warrant the extraordinary action of taking Jones into custody." We view these assertions to be without merit.

The plaintiff's claim based on the disclosure of a "private fact" must fail because ABC has disclosed no private fact. The theory that the plaintiff's arrest was a private affair is without merit. A person's arrest must be recorded by the police, and that record is public information. Moreover, the public has a right to be informed about matters in which it has a legitimate concern. See, e.g., *Attorney Gen.* v. *Collector of Lynn*, 377 Mass. 151, 156 (1979) (when "public interest in obtaining information substantially outweighs the seriousness of any invasion of privacy, the private interest in preventing disclosure must yield to the public interest"). Where the information concerning a plaintiff is already public, a defendant is not liable merely for giving further publicity to that information. Restatement (Second) of Torts § 652D comment b (1977).

The plaintiff argues that ABC's broadcast of his arrest cast him in a "false light" and constituted an invasion of privacy under G. L. c. 214, § 1B. We need not address the issue whether G. L. c. 214, § 1B, encompasses a false light claim for invasion of privacy.[12] We note only that (1) the impression created by the report was not false, as alleged by the plaintiff, and (2) nothing in ABC's broadcasts involved a distortion or high degree of offensiveness in the portrayal of the plaintiff's

[12] False light invasion of privacy theory has yet to be adopted in Massachusetts. *Fox Tree* v. *Harte-Hanks Communications, Inc.*, 398 Mass. 845, 848-849 (1986).

arrest sufficient to constitute false light invasion of privacy. See generally Restatement (Second) of Torts, *supra* at § 652E.

Although the plaintiff also raises an invasion of privacy claim against Taibbi and Channel 5, that portion of the plaintiff's argument does not rise to the level required to merit our consideration of the issue. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

III. *Conclusion.*

Accordingly, we conclude that the publication of the statements of Shamshak's family, to the effect that he (Shamshak) was telling the truth and therefore, inferentially, that Jones was the Hillside strangler, was not privileged. Therefore, it is for a jury to determine whether the defendants' decision to broadcast those statements was reasonable under the circumstances. With respect to the plaintiff's claim regarding the republication of Shamshak's allegations, as we have stated above, the republication of Shamshak's allegations would be privileged if made public as part of an official statement by the LAPD. The burden is on the defendants to prove, when the issue is properly raised, the existence of a privilege to publish a defamatory communication. *Humphrey* v. *National Semiconductor Corp.*, 18 Mass. App. Ct. 132, 134 (1984). Restatement (Second) of Torts, *supra* at § 613(2). The defendants have made no showing that Shamshak's allegations were made public during an official proceeding as required by the privilege. The mere fact that the statements to the press after Jones's arrest concerning Shamshak's allegations were made by the Los Angeles police chief is insufficient to establish that those allegations were privileged. We conclude that, for the purposes of summary judgment, the defendants have failed to satisfy their burden of proof on this issue. Therefore, on remand, the trial court shall determine whether Shamshak's allegations were made public as part of an official statement by the LAPD. If the republication of Shamshak's allegations is not privileged, it is also for a jury to determine whether the defendants' decision to broadcast the allegations was reasonable. Summary judgment was properly granted with respect to the remainder of the plaintiff's defamation claims. Summary

judgment was also properly granted with respect to the plaintiff's invasion of privacy claims.

The case is remanded for further proceedings in accordance with this opinion.

*So ordered.*

ABRAMS, J. (concurring). I believe the court correctly has applied the principles of defamation law and the "fair report" privilege in reaching its conclusion that summary judgment was improperly granted as to two of the plaintiff's claims.

The court correctly applies the Restatement (Second) of Torts § 611 (1977), to conclude that the statements of Shamshak's family and the republication of Shamshak's allegations, on the basis of the summary judgment record, do not fall within the scope of the fair report privilege.[1] The defendants, however, have not provided the court with a record sufficient to determine whether the republication of Shamshak's allegations falls within the fair report privilege. The record is unclear as to whether Shamshak's allegations were disclosed in official statements.[2] While the scope of § 611 of the Restatement (Second) of Torts as to what statements are official statements is not clearly defined, see *Cianci* v. *New Times Publishing Co.*, 639

---

[1] In his brief, the plaintiff asserts that "[t]he exclusive Shamshak family interview, filmed before [the plaintiff's] detention, containing the answers of family members to Taibbi's leading questions, and Taibbi's comments, is an obvious [i]ndorsement of Shamshak's veracity, and therefore of his defamatory accusations." The plaintiff's indorsement theory is not valid in this case, and the court so states. See *ante* at 794.

The court also states, *ante* at 790 n.5, that the plaintiff argues that Taibbi's questions during the course of the interview with Gates constituted an indorsement of Shamshak's allegations. Again, the indorsement theory is not valid in this case and therefore liability may not be imposed on that basis.

[2] An Associated Press report contained in the record indicates that Police Chief Gates held a press conference and disclosed the substance of Shamshak's allegations. The record, however, does not disclose the source of the defendants' information. Therefore, the issue whether the allegations were part of the official statements of the police department must be left open.

F.2d 54, 70 (2d Cir. 1980), the developing law appears to be that statements made at a press conference by law enforcement officials relating to an arrest and the investigations forming the basis of the arrest should be considered official statements and therefore should fall within the fair report privilege. *Kilgore* v. *Younger*, 30 Cal. 3d 770, 776-777 (1982). See *Porter* v. *Guam Publications, Inc.*, 643 F.2d 615, 617 (9th Cir.), cert. denied, 454 U.S. 940 (1981) (privilege applies to republication of information appearing in police bulletin); *Mathis* v. *Philadelphia Newspapers, Inc.*, 455 F. Supp. 406, 416-417 (E.D. Pa. 1978) (privilege applies to republication of information supplied by police department and FBI in informal reports concerning ongoing investigation); *O'Neal* v. *Tribune Co.*, 176 So. 2d 535, 547 (Fla. 1965) (privilege applies to publication of matters which involve "open violations of law, public misconduct justifying police interference, and matters in connection with and in aid of prosecution of inquiries regarding the commission of a crime"); *Stice* v. *Beacon Newspaper Corp.*, 185 Kan. 61, 66-67 (1959) (privilege applies to republication of "matters in connection with and in aid of the prosecution of inquiries regarding the commission of crime"). See also *Kilgore* v. *Koen*, 133 Or. 1, 12 (1930) (privilege applies to republication of statements made by police). Cf. *Yerkie* v. *Post-Newsweek Stations, Michigan, Inc.*, 470 F. Supp. 91, 94 (D. Md. 1979) (the privilege "does not apply to statements made by the police . . . as to the facts of the case or the evidence expected to be given which have not yet been made a part of the judicial proceeding or of the arrest process"); Restatement (Second) of Torts, *supra* at § 611 comments d and h. While this court has not determined what statements constitute official statements, in an analogous situation, the court said that a newspaper is not liable for republishing stories from reputable wire services. See *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. 32, 37-38 (1985). The same reasoning may apply to republishing public statements by the police. The court correctly leaves that issue open.

Last, assuming the statements do not fall under the privilege of § 611, the statements may be protected under Restatement

(Second) of Torts, *supra* at § 612. That section provides in relevant part: "(1) one who provides a means of publication of defamatory matter published by another is privileged to do so if . . . the person providing the means of publication reasonably believes that the other is privileged to publish it." Although statements may be privileged under this section, there would be a factual issue to be resolved by the fact finder as to whether the republisher "reasonably" believed that the person providing the information initially was privileged to do so.

A court's obligation is to " 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose Corp* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984), quoting *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 285 (1964). The court, however, may not supply missing facts in an effort to fulfil its obligation. The task of supplying the needed facts is for the parties.[3]

---

[3] There may be no factual dispute as to the source of the defendants' information. If the facts are not in dispute and if the defendants file a new motion for summary judgment, the judge again should consider whether those statements fall within the fair report privilege as a matter of law. Although the court has not yet followed the Supreme Court's decisions in *Celotex Corp.* v. *Catrett*, 477 U.S. 317 (1986) and *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242 (1986), I believe that, in ruling on the defendants' motion for summary judgment, the judge should follow those cases and place on the plaintiff a somewhat greater burden because the plaintiff has the burden of proof on the issue of fault and opposes the motion. See *Celotex, supra; King* v. *Globe Newspaper Co., ante* at 719 (1987).