Gants, J.
The defendant Winchester Star (“the Star”) is a local newspaper wholly owned by the defendant Community Newspaper Company, which is a division of the defendant Herald Media, Inc. (collectively, “the newspaper defendants”). On April 5, 2001, the Star published an article written by staff writer Maureen O’Connell (“O’Connell”) entitled, “Dispute leads to stabbing, arrest,” which is reprinted below in its entirety:
A dispute between a Winthrop Street woman and a Billerica woman who works as a nanny for a Hill-crest Parkway family turned ugly last week, as the Billerica nanny was sent to Winchester Hospital after being poked with a knife.
Celine Oort of 15 Winthrop Street, Winchester, was arrested and charged with assault and battery with a dangerous weapon, after the Billerica woman told police Oort came to her home with a knife and threatened her, before cutting her shirt and making a small incision with the three-inch knife.
The dispute between the two women began last week. On Thursday, the Billerica woman and her friend told police they had received threats from Oort.
Several hours later, the Billerica woman called the police to her Hillcrest Parkway workplace to report her vehicle had been broken into and things taken while she was at the police station. A CD player, sunglasses, license and military identification card were missing from the car. The woman told police she had seen Oort’s car in the vicinity.
On Saturday, the Billerica woman again called the police. She said Oort had come to the door of the Hillcrest Parkway home and threatened her with a knife, before slashing her shirt and leaving a small puncture wound on the right side of her stomach.
Police immediately went to Oort’s home and placed her under arrest. The Billerica woman was taken to Winchester Hospital by Fire Department ambulance.
On September 25, 2002, the plaintiff Celine Oort and her husband, Michael Oort (“the Oorts”), filed this defamation action, with Ms. Oort seeking compensation for the alleged damage to her reputation in the community and Mr. Oort seeking damages for his loss of consortium.[1] The newspaper defendants now move for summary judgment. After hearing and for the *387 reasons stated below, the newspaper defendants’ motion for summary judgment is ALLOWED.
BACKGROUND
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to the Oorts and should not be misunderstood as findings of the Court.
The April 5, 2001 article was printed by the Star on the page that contained its “police log” and was located immediately below that log. The article was prepared by O’Connell based solely on two police reports she had reviewed at the Winchester Police Department, but was unable to copy, in keeping with Winchester Police policy. She did not conduct any interviews or pursue any additional inquiry beyond reading the police reports.
The March 29, 2001 Police Report
The first police report, dated March 29,2001, stated that the reporting Winchester police officer was sent to 36 Hillcrest Parkway in Winchester that morning regarding a reported larceny. When he arrived, he spoke to Rosemarie DaSilva (“DaSilva”), who worked as a nanny at that address for the Hodge family. With DaSilva was another woman who worked as a nanny, Sally Farrell (“Farrell”). They reported that they had earlier gone to the police station and spoken with another officer about Ms. Oord, who lived at 9 Winthrop Street in Winchester. Farrell reported that she had been receiving hang-up calls at her home, and believed that Ms. Oord had been making those calls. Farrell said that Ms. Oord was upset with her because Oord had recommended her for a nanny job, which Farrell had accepted and then quit. Farrell said that Ms. Oord was verbally abusing DaSilva because DaSilva was her friend.
DaSilva and Farrell said that they had been at the police station at around 9:45 a.m. When they returned to 36 Hillcrest Parkway, DaSilva saw that her car had been entered and her CD player, her sunglasses, and her Massachusetts license and military identification had been stolen. DaSilva and Farrell said that they had seen Ms. Oord in her car drive past 36 Hillcrest Parkway on March 28 and earlier on March 29. DaSilva also reported that she had two tires blow out on her car when she was returning home from her work at 36 Hillcrest Parkway.
The officer later spoke with Tom Hodges, the owner of the house at 36 Hillcrest Parkway and the employer of DaSilva. He reported that there had been “some friction” between Ms. Oord and DaSilva. He mentioned an incident in which DaSilva had told him that Ms. Oord had told her that Hodges’ four-year-old son was gay. Hodges confronted Ms. Oord about the statement, and she denied ever having made it. Hodges added that Ms. Oord does not act or do the type of things she is being accused of, but he was concerned about losing his nanny if these incidents were to continue.[2]
The March 30, 2001 Police Report
The second police report, dated March 30,2001 and prepared by a different Winchester police officer, declared that the reporting officer, with other police officers and Fire Department Emergency Medical Technicians, went to 36 Hillcrest Parkway at roughly 10:30 that morning to respond to a reported stabbing. Upon their arrival, they were met by DaSilva, who said she had just been threatened and stabbed by Ms. Oort. She showed them a hole in her shirt and a small puncture mark on the right side of her stomach. While she received medical attention, she said that she had been taking care of the children when the doorbell rang. She answered it and was met by Ms. Oort, who held a knife to her stomach and said, “Don’t call the cops again or this will be worse next time.” DaSilva said that she did not see a car in the area. She could not describe the knife but estimated that the length of the blade was three inches.
The reporting officer, with a colleague, then went to 9 Winthrop Street to speak with Ms. Oort. When he arrived, he noticed that Ms. Oort’s car was covered with snow and did not appear recently to have been driven. When Ms. Oort answered the door, she was holding an infant, and immediately asked if her other daughter was all right. After being given her Miranda rights, Ms. Oort said that she had not been out all day and that her baby had just woken up. She was then placed under arrest for assault and batteiy with a dangerous weapon.[3]
DISCUSSION
Before specifically addressing the Oorts’ defamation claim, it is necessary to explore certain facets of the law of defamation.
A cause of action for the defamation of a private person will be sustained where the plaintiff can show (1) that the defendant published a false and defamatory statement concerning the plaintiff; (2) the defendant was negligent in ascertaining whether the statement was true before publishing it; and (3) the plaintiff suffered actual injury or harm as a result of the publication. Reilly v. The Associated Press, 59 Mass.App.Ct. 764, 769 (2003).
As to the first element, the court must determine, as a matter of law, “whether the statement is reasonably susceptible of a defamatory meaning.” Foley v. Lowell Sun Publishing Co., 404 Mass. 9, 11 (1989), citing Jones v. Taibbi, 400 Mass. 786, 791-92 (1987). Generally, a statement that a person committed a crime is defamatory per se. Jones v. Taibbi, 400 Mass. at 792. Moreover, generally, “(a)bsent a privilege, ‘the republisher of a defamatory statement is subject to liability as if he had originally published it.’ ” Id., *388 quoting Appleby v. Daily Hampshire Gazette, 395 Mass. 32, 36 (1985), which quoted Restatement (Second) of Torts §578 (1977). Therefore, if the Star had simply reported that a named private person had accused Ms. Oort of stabbing DaSilva in the stomach, the Star would be liable for defamation if Ms. Oort, in fact, had not stabbed DaSilva and the Star was negligent in repeating the false accusation; The Star could not avoid liability simply by stating that it fairly and accurately reported what the private person had said; it is obliged to take reasonable steps to ensure that the private person’s allegation is correct before it prints it. See Jones v. Taibbi, 400 Mass. at 792. As the Supreme Judicial Court has declared, “Liability for a defamatory statement may not be avoided ‘merely [by] adding a truthful preface that someone else has so stated.’ ” Id., quoting Ricci v. Venture Magazine, Inc., 574 F.Sup. 1563, 1572 (D.Mass. 1983).
However, when the accusation of a crime comes in the form of an arrest or indictment, the law provides the press with a “fair report privilege” that permits a newspaper to report the fact that someone has been arrested or indicted for a crime without taking reasonable steps to ensure that the allegation is correct before it prints it. See Jones v. Taibbi, 400 Mass. at 794-95. All that the newspaper must do to obtain immunity from a defamation claim is be fair and accurate in describing the government’s allegation; it need not determine whether the person is guiliy of that crime. Id. See ELM Med. Lab., Inc. v. RKO Gen., Inc., 403 Mass. 779, 782 (1989), abrogated on other grounds by United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990). See also Sibley v. Holyoke Transcript-Telegram Publ’g Co., Inc., 391 Mass. 468, 470-71 (1984). This “fair report privilege” “derives from the recognition that the general public has the right to know of official government actions that affect the public interest, that news outlets are the best way to disseminate such information, and that news outlets would be willing to make such reports only if they were free from liability.” Reilly, 59 Mass.App.Ct. at 776, citing ELM Med. Lab., Inc., 403 Mass, at 782.
The “fair report privilege” is not limited to the fact that an individual has been charged with a crime and the identification of the specific crime charged. It also includes “official statements” made by the police or prosecutive agency regarding the arrest, whether that official statement be in the form of an arrest report or a press release or press statement outlining the substance of the criminal allegations. See Jones v. Taibbi, 400 Mass. at 796-97. The privilege does not extend to “unofficial statements” made by the police, the prosecutor, or witnesses as to the facts of the case or the evidence expected to be given. Id. at 786. Nor does the privilege apply to “witness statements to police, whether appearing in an official police report or not, where no official police action is taken.” Reilly v. The Associated Press, 59 Mass.App.Ct. at 776. Pragmatically, applying this case law, a police report that serves as the arrest report falls within the privilege; a police report regarding an investigation that does not lead to an arrest falls outside the privilege.
In the context of the instant case, a fair reporting of the March 30, 2001 police report plainly falls within the privilege, because it is an official report of the events surrounding Ms. Oort’s arrest and can fairly be characterized as the arrest report. The more difficult question is whether the March 29, 2001 police report falls within or outside the privilege. To be sure, the investigation conducted on March 29, 2001 did not lead to Ms. Oort’s arrest that day. Indeed, she was never arrested for any of the misconduct alleged in that interview — larceny from a motor vehicle or malicious destruction of property. Yet, the information obtained from that interview was relevant to the stabbing described in the March 30, 2001 arrest report because it explained the animosity that had developed between Ms. Oort and DaSilva, and provided a possible motive for the stabbing. Without the information contained in the March 29 police report, the information in the March 30 report appears incomplete, because it fails to consider why Ms. Oort would come to the house where DaSilva worked and stab her. This Court concludes that the March 29 police report, because it describes a sequence of events that allegedly led to the stabbing on March 30 and helps to explain the underlying circumstances of that stabbing, is effectively the first part of the official police report that was completed the next day and therefore falls within the ambit of the “fair report privilege.”
In reaching this finding, this Court recognizes that the spirit of the “fair report privilege” is that the press needs to be able to report about arrests and would be reluctant to do so if it needed independently to verify the information that formed the basis for the arrest. The privilege is not limited simply to the fact that a person was charged with a particular crime; it also encompasses the description of the criminal activity that led to the criminal charges, as long as that information is contained in an official police report. In some cases, where the crime charged is a single event with no relevant history or background, there will likely be a single arrest report setting forth the defendant’s conduct on the day he was arrested. In other cases, where the defendant engaged in a pattern of conduct or committed a sequence of events or had a prior relationship with the victim, as generally found in cases alleging domestic abuse or obstruction of justice, a description of the defendant’s conduct on the day of the arrest may poorly describe the basis for the arrest. When the press seeks to report on the arrest, the police can be expected to provide the press with the police reports that explain the arrest, whether that be a single report or a series of related reports. Pragmatically, for the veiy reasons the “fair report privilege" exists, the press needs access to the information that will enable it competently to report on the arrest and also needs to know with some clarity which police *389 reports fall within the privilege and which do not. The rule established by this Court would permit the press the “safe harbor” of knowing that it may publish the official reports provided by the police to explain the basis for the arrest without risking a defamation suit. Without this safe harbor, the press will be reluctant to reach beyond the arrest report prepared on the day of the arrest, and therefore will be less likely in certain cases meaningfully to report the background and basis for the arrest.
As the name of the privilege suggests,'■publication of an otherwise defamatory statement in an official police report leading to an arrest is privileged under the “fair report privilege” only if the information in the official police report is fairly reported. A fair report need not be a verbatim repetition of the official report. See MiGi Inc. v. Gannett Massachusetts Broadcasters, Inc., 25 Mass.App.Ct. 394, 396 (1988) (report need not have “duplicated or tracked the official statement”). It must, however, accurately reflect the content of the official report or fairly summarize that official report. See Jones, 400 Mass. at 794-95 n. 11. Perfect accuracy is not required, especially when the news report summarizes the official report; it is sufficient that the report be “a rough-and-ready summary that was substantially correct.” ELM Med. Lab. Inc., 403 Mass. at 783, quoting MiGi Inc., 25 Mass.App.Ct. at 396. Stated differently, a report is fair “if its ‘gist’ or ‘sting’ is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced.” ELM Med. Lab. Inc., 403 Mass. at 783. Minor inaccuracies will not serve to abrogate the privilege. Brown v. Hearst Corp., 862 F.Sup. 622, 630 (D.Mass. 1994), aff'd, 54 F.3d 21 (1st Cir. 1995). Whether the “fair report privilege” applies to a news article is a question of law. Joyce v. Globe Newspaper Co., 355 Mass. 492, 498 (1969).
Here, the Oorts claim that three alleged inaccuracies take the Star’s article outside the “fair report privilege.” First, they contend that the first sentence:
A dispute between a Winthrop Street woman and a Billerica woman who works as a nanny for a Hill-crest Parkway family turned ugly last week, as the Billerica nanny was sent to Winchester Hospital after being poked with a knife.
falsely states that there was a “dispute” between Ms. Oort and DaSilva that preceded the alleged stabbing. A fair reading, however, of the March 29 police report supports the characterization of a pre-existing “dispute,” whether caused by DaSilva’s friend quitting a job for which she had been recommended by Ms. Oort or by DaSilva reporting to her employer that Ms. Oort had said that his four-year-old son was gay. The use of the word “dispute” fairly characterizes the gist of the March 29 report.
Second, the Oorts contend that the first sentence characterizes these events as true rather than as police allegations. In evaluating an allegedly defamatory statement, a court must “examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence.” Foley v. Lowell Sun Publishing Co., 404 Mass. at 11, quoting Myers v. Boston Magazine Co., 380 Mass. 336, 341-42 (1980), which quoted Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980). Viewing this first sentence in the context of the entire article and its location on the news page (below the police log), this Court finds that a reasonable reader would not conclude that the Star was declaring that Ms. Oort had actually committed the stabbing but instead would conclude that it was simply relating the allegations that led to her arrest. See Foley, 404 Mass. at 11-12. In short, this article would not be perceived by any reasonable reader as an investigative news story uncovering a stabbing; it would simply be understood as a local newspaper reporter reporting the information surrounding an arrest.[4]
Third, the Oorts contend that the article is not a fair report because it omitted exculpatory information in the police report that would shed doubt on the accuracy of the allegations against Ms. Oort. Specifically, the Oorts note that the article failed to include the information in the March 30 police report that:
when the police came to Ms. Oort’s house immediately after learning that DaSilva had accused her of the stabbing, Ms. Oort came to the door carrying her baby, and told the police that she had been home all day and that her baby had just awoken; and the police observed that her automobile was still covered with snow, which indicated that she had not driven that car that day.
This Court recognizes that the “fair report privilege” applies only when the “report is accurate and complete or a fair abridgement of the occurrence reported.” Jones, 400 Mass, at 794-95 n.11, quoting Restatement (Second) of Torts, §611 (1977). As a corollary, this Court also recognizes that the omission of important exculpatory information may mean that a news article is not “a fair abridgement of the occurrence reported.” On the other hand, this Court also recognizes that a reporter who summarizes sometimes lengthy police reports must necessarily leave out some information, some share of which the accused may justifiably contend to be exculpatory. If courts were to find that the omission of any exculpatory information denies the press the benefit of the “fair report privilege,” the scope of the privilege would be severely narrowed, because virtually any summary may fail to include information that the law would describe as exculpatory. The test ultimately must be whether the article fairly summarizes the gist of the information in the police reports, balancing the public’s need for a vigilant press to report upon arrests and indictments and the defendant’s need that information in the police *390 reports suggesting that she was wrongly accused not be concealed.
When a news article simply declares that an individual has been arrested for a particular crime, no exculpatory information need be included in the article because no inculpatory information has been included. When, as here, the news article provides details as to the commission of the crime, the obligation of a reporter to the reading public is similar to that of the prosecutor to a grand jury — she may not conceal information that so greatly undermines the information published as fundamentally to distort a reasonable reader’s understanding of the gist of the police report. See Commonwealth v. McGahee, 393 Mass. 743, 746 (1985); Commonwealth v. O’Dell 392 Mass. 445, 447 (1984). Not every omission of exculpatory information from the grand jury justifies the dismissal of an indictment. See generally Commonwealth v. Pina, 406 Mass. 540, 549 (1990) (withholding of exculpatory evidence from the grand jury is not proper ground for dismissal of an indictment unless the omissions distorted the material that was presented to the grand jury). So, too, not every omission of exculpatory information from a news article justifies the loss of the “fair report privilege.”
Here, the omitted information from the police report falls into two categories; (1) the omission of Ms. Oort’s uncorroborated alibi and (2) the omission of circumstantial evidence indicating that she did not travel in her car that day. As to the first, the failure to include a defendant’s denial or alibi in a news article does not so greatly undermines the information published as fundamentally to distort a reasonable reader’s understanding of the gist of the police report. When a reasonable reader sees no confession described in the article, he assumes that the defendant will deny guilt; the absence of the defendant’s denial does not fundamentally alter the reader’s understanding of the allegations. Indeed, this Court notes that a grand jury indictment need not be dismissed simply because the prosecutor failed to inform the grand jury of the defendant’s denial or uncorroborated alibi. See Commonwealth v. Bobilin, 25 Mass.App.Ct. 410, 413 (1988) (in a rape case, prosecutor’s withholding from the grand jury of the defendant’s statement to the police that the encounter was consensual did not unfairly distort the evidence presented against the defendant, because “the grand jury almost certainly assumed that the accused would maintain [that the alleged victim consented]”); Commonwealth v. Roman, 414 Mass. 642, 648 (1993) (in a cocaine trafficking case, withholding from the grand jury of the defendant’s statement to the State Trooper that the cocaine found in his possession was for his own personal use did not justify dismissal of the grand jury’s indictment because “the failure to present the defendant’s self-serving statement to the grand jury did not greatly undermine the validity of the evidence presented”).
As to the second omission, this circumstantial evidence, while exculpatory, is not so suggestive of innocence that fairness requires its disclosure in the article, especially since the police report indicates that DaSilva did not see a vehicle in the area around the time she was stabbed. Nor does this second omission, when considered together with the first, render the article’s summary of the police report fundamentally unfair.
Since this Court finds that the news article’s reliance on both the March 29 and 30 police reports was justified by the “fair report privilege,” and that the article’s summary of these reports, despite the omission of exculpatory evidence, was a “fair report,” this Court concludes that the “fair report privilege” shields the newspaper defendants from Ms. Oort’s defamation claim. Since summary judgment must be granted as to Ms. Oort’s defamation claim, it must also be granted as to Mr. Oort’s consortium claim, which is purely derivative of the defamation claim. See Diaz v. Eli Lilly & Co., 364 Mass. 153, 167-68 (1973).
ORDER
For the reasons stated above, the newspaper defendants’ motion for summary judgment is ALLOWED.

The Oorts also filed claims against the defendant Rosemarie DaSilva, but these are not the subject of this summary judgment motion.

The report mistakenly describes this last statement as having been made by Tom “Hogan” but it is plain from the context that the officer meant Tom “Hodges.”

There were three addenda to this police report, prepared by different police officers. Two were written on March 30, 2001 and the third on April 4, 2001. O’Connell, the Star’s reporter, testified that she was certain she did not see the April 4 addendum before writing her article, but was not sure whether she read the two addenda prepared on March 30. Since the article did not mention anything contained in the March 30 addenda and since the allegation of defamation does not rest on the omission of the information contained in the addenda, this Court need not describe the contents of any of the addenda.

In Foley, the Supreme Judicial Court declared that a news article reporting an arrest is not “reasonably susceptible of a defamatory meaning” when it reasonably would be understood as reporting a person’s arrest for a crime rather than declaring that the person actually committed the crime. 404 Mass, at 11-12. Having reached that conclusion, the Court decided that it need not reach the question of whether the “fair report privilege” even applied. Id. at 10 n.4. This Court, in view of the prevailing case law regarding defamation, has found it more appropriate first to decide the question of whether the “fair report privilege” applies, and evaluate whether the article fairly describes the basis for the arrest or reflects an independent accusation by the newspaper in determining whether the article falls within or outside that privilege.