JOHN M. PECKHAM, THIRD, *vs.* BOSTON HERALD, INC.,
& another.[1]

No. 97-P-1678.

Suffolk. January 19, 1999. - November 26, 1999.

Present: ARMSTRONG, PERRETTA, & RAPOZA, JJ.

*Newspaper. Privacy. Practice, Civil,* Summary judgment.

Discussion of the concept of information being a matter of "legitimate public concern" that would make its public disclosure not actionable. [286-288]

The issue of newsworthiness in a tort claim under G. L. c. 214, § 1B, of public disclosure of private facts may properly be decided on summary judgment. [288-289]

In an action brought under G. L. c. 214, § 1B, against a newspaper for public disclosure of private facts, the judge correctly entered summary judgment in favor of the defendant newspaper for its publication of a story about a paternity suit brought against the plaintiff by his former employee, where, in the circumstances, the article was newsworthy, if only marginally so. [289-290]

CIVIL ACTION commenced in the Superior Court Department on July 8, 1992.

The case was heard by *Barbara J. Rouse,* J., on a motion for summary judgment.

*Juliane Balliro* for the plaintiff.

*Elizabeth A. Ritvo* for the defendant.

ARMSTRONG, J. The plaintiff, John M. Peckham, III, appeals

---

[1]News Group Boston, Inc., which was described in the complaint as the publisher of the Boston Herald newspaper. The judge indicated in her decision that News Group Boston, Inc., had changed its name to Boston Herald, Inc., and that the two corporations were one. For purposes of this decision we refer to both collectively as the Boston Herald. Two other persons, Louise Gendron and Franklin H. Levy, were originally named defendants. The record does not indicate what happened to the claim against Gendron, but it does indicate that in September, 1995, the plaintiff voluntarily dismissed the claim against Levy. The judge in her decision stated that the Boston Herald was the only remaining defendant.

from a judgment for the defendant newspaper, the Boston Herald (Herald), on Peckham's tort claim of public disclosure of private facts under G. L. c. 214, § 1B. The judge correctly allowed the Herald's motion for summary judgment, although we modify to some extent the rationale relied on by the judge.

The material facts of the case are not disputed. Peckham was a businessman of stature in the Boston community — a leading realtor[2] and the president of at least two real estate brokerages, the Peckham Boston Advisory Company and the Investment Network of America. In 1989, Peckham received the Realtor of the Year award from the Greater Boston Real Estate Board. Besides being a business leader, Peckham was a recognized civic leader, active in "The Ten Club," a social and philanthropic organization composed of persons who, like himself, were former recipients of "The Ten Outstanding Young Leaders Award" given annually by the Greater Boston Junior Chamber of Commerce.

In early 1989, Peckham hired Louise Gendron as a real estate broker for one of his companies. The two worked in the same office and became involved in an intimate relationship. In the summer of 1989, Gendron told Peckham that she was pregnant with his child. He did not acknowledge paternity and did not reveal Gendron's announcement except to his daughter Holly and to Ronnie Botkin, a colleague and close friend. In September of 1989, sometime after Gendron had ended her relationship with Peckham, he authorized the termination of Gendron's employment.

On November 20, 1989, Gendron gave birth to a son. Peckham had not agreed to pay medical expenses or child support and insisted on genetic testing to determine the identity of the father. In the following month Gendron filed a paternity action against Peckham in the Probate and Family Court. Around that time, Peckham told his daughter Holly and Michael Pearlman, a close friend, about the existence of the paternity suit. At deposition, Botkin also testified to being aware of the paternity action.

On January 10, 1990, a columnist for the Herald, Norma Nathan, contacted Mr. Franklin Levy, Gendron's attorney. Without revealing how she found out about the paternity suit, Nathan asked Levy about it. In their brief conversation,

[2]Peckham was designated as a Certified Commercial Investment Member by the Commercial Investment Real Estate Institute and a Certified Property Manager by the National Institute of Real Estate Managers.

Levy confirmed the existence of the action and discussed the details of an affidavit he was preparing to file on Gendron's behalf to support the allegations of her complaint.[3] On January 11, 1990, the Herald published in its daily newspaper the following story as part of Nathan's social/gossip column called "The Eye":

"Oh baby! Business and pleasure just don't mix

"Peckham's bad boy: Bulletin, bulletin, bulletin!

"Bigtime Boston real estate dealer Jack Peckham (that's John M. Peckham III) 1989 Realtor of the Year and one of the city's 1989 10 Outstanding Young Leaders, has a brand new title: Daddy.

"It's true! It's true!

"Peckham, 56, president of Peckham Boston, has been taken to court on a paternity suit. He's the father of 2-month-old John Richard Gendron, alleges Louise Gendron, who once worked for him.

"In papers filed in Suffolk Probate Court, she asks for child support, health insurance and payment of hospital and delivery costs.

"In his answer, the twice-married, twice-divorced Peckham says he doesn't know that this is his baby.

"Her lawyer — Franklin Levy of Boston — says Gendron was hired as a real estate broker by Jack. She lived on the 18th floor of his Charles River Park building. He lived on the 22nd. Eye say! Did they compromise and meet on the 20th? Anyway, they dated. They traveled.

" 'He showed her a great time until she got pregnant,' said Levy. 'Then he fired her and refuses to acknowledge the baby.'

"The jobless Gendron says that if she doesn't have

---

[3]At deposition, Levy denied giving Nathan copies of the complaint and answer.

help, she'll go on welfare. She's caring for the baby with help from her family.

"His lawyer is Paul Kane of Boston, bigtime divorce lawyer.

" 'No comment,' says Kane. Honestly, no one tells a gossip anything!"

In May of 1990, after receiving the results of genetic testing done in connection with the paternity suit, Peckham acknowledged that he fathered Gendron's son and has since not concealed that fact.

In July, 1992, Peckham filed suit against Levy and Gendron, and in September, 1994, amended his complaint to add a claim against the Herald,[4] for the public disclosure of private facts under G. L. c. 214, § 1B.[5] The Superior Court granted the Herald's June, 1997, motion for summary judgment on the basis that Peckham's revelation of the existence and details of the paternity action to his daughter, Pearlman, and Botkin left these facts no longer private.

The Massachusetts appellate courts have had no occasion to consider the extent to which one forfeits the privacy of personal facts by discussing them with one's close friends and family. Reported cases have dealt primarily with broad-based disclosures, whereby information that is a matter of public record or is otherwise made open to the public view is generally deemed no longer private. See *Jones* v. *Taibbi*, 400 Mass. 786, 801 (1987); *Globe Newspaper Co.* v. *Police Commr. of Boston*, 419 Mass. 852, 860 (1995), citing Restatement (Second) of Torts § 652D, at 385 (1977); *Cefalu* v. *Globe Newspaper Co.*, 8 Mass. App. Ct. 71, 77 (1979), appeal dismissed and cert. denied, 444 U.S. 1060 (1980). Perhaps most germane to the present case is this observation from *Schlesinger* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 521 (1991): "[A] person may relinquish a privacy right by engaging in certain activities, or by placing himself in certain contexts where his legitimate expectation of privacy is reduced." Where one

---

[4]Norma Nathan had passed away before Peckham filed his lawsuit.

[5]General Laws c. 214, § 1B, as appearing in St. 1974, c. 193, § 1, provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

discusses sensitive personal matters with a close relative or trusted friend, one can often legitimately expect that these matters will remain confidential. See Restatement (Second) of Torts § 652D comment b, at 386 (1977) ("Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends"). It is not unreasonable to argue that it should be deemed a factual question whether a given person, due to the particular circumstances and manner of disclosure, has relinquished an expectation of privacy. On this record, which provides no detail about the place, manner, and confidentiality of the discussions between Peckham and the others, viewed in the light most favorable to him, there may thus be a genuine issue of material fact whether Peckham compromised his privacy simply by discussing the paternity suit with his daughter and two close friends. That issue we need not and do not resolve.

The Herald argues, as it did below, that even if the above information were private, its public disclosure was not actionable because, as a matter of common law and the First Amendment, the information was a matter of "legitimate public concern" that could not be the subject of an invasion of privacy action.[6] See *George W. Prescott Publishing Co.* v. *Register of Probate for Norfolk County*, 395 Mass. 274, 278 (1985); *Hast-*

---

[6]The plaintiff would have us respond to the argument by ruling instead that where the "public interest in obtaining information *substantially outweighs* the seriousness of any invasion of privacy, the private interest in preventing disclosure must yield to the public interest" (emphasis supplied). *Jones* v. *Taibbi*, 400 Mass. at 801, quoting from *Attorney Gen.* v. *Collector of Lynn*, 377 Mass. 151, 156 (1979). However, that test applies in the context of the privacy exemption to the public records law, G. L. c. 4, § 7, Twenty-sixth, which embodies "a standard more favorable to nondisclosure than G. L. c. 214, § 1B," *Pottle* v. *School Comm. of Braintree*, 395 Mass. 861, 867 n.6 (1985), quoting from *Attorney Gen.* v. *School Comm. of Northampton*, 375 Mass. 127, 132 (1978). The former statute does not apply to this case because judicial records are not within its definition of "public records." See *New Bedford Standard-Times Publishing Co.* v. *Clerk of the Third Dist. Ct. of Bristol*, 377 Mass. 404, 407 (1979). We do not view the reference to the "substantially outweighs" test in *Jones* v. *Taibbi*, *supra*, a case under the invasion of privacy statute, as departing from the standard for such cases declared in the Restatement and quoted with approval in *George W. Prescott Publishing Co.* v. *Register of Probate for Norfolk County*, 395 Mass. 274, 278 (1985). The failure of the plaintiff's claim in the *Taibbi* case rested primarily on the fact that the information at issue, the plaintiff's arrest, was a matter of public record and was thus not a private fact. See 400 Mass. at 801.

*ings & Sons Publishing Co.* v. *City Treasurer of Lynn,* 374 Mass. 812, 818 (1978); *Jones* v. *Taibbi,* 400 Mass. at 801; Restatement (Second) of Torts § 652D & comment d (1977). See also *Cox Broadcasting Corp.* v. *Cohn,* 420 U.S. 469, 492 (1975); *Smith* v. *Daily Mail Publishing Co.,* 443 U.S. 97, 103 (1979); *The Florida Star* v. *B.J.F.,* 491 U.S. 524, 533 (1989). Although the boundaries of "legitimate public concern" have not been comprehensively explored in the Massachusetts case law, the Restatement (Second) of Torts provides the following relevant discussion in comments g and h to § 652D, at 390-391:

> "*g. News.* Included within the scope of legitimate public concern are matters of the kind customarily regarded as 'news.' To a considerable extent, in accordance with the mores of the community, the publishers and broadcasters have themselves defined the term,[7] as a glance at any morning paper will confirm. Authorized publicity includes publications concerning homicide and other crimes, arrests, police raids, suicides, marriages and divorces, accidents, fires, catastrophes of nature, a death from the use of narcotics, a rare disease, the birth of a child to a twelve-year-old girl, the reappearance of one supposed to have been murdered years ago, a report to the police concerning the escape of a wild animal and many other similar matters of genuine, even if more or less deplorable, popular appeal."

> "*h. Private facts.* . . . . The extent of the authority to make public private facts is not, however, unlimited. There may be some intimate details of her life, such as sexual relations, which even [a famous] actress is entitled to keep to herself. In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the

---

[7]Some courts have suggested that the standard in such cases is whether the publisher abused its discretion in deciding that the information published was of legitimate concern to the public. See, e.g., *Gilbert* v. *Medical Economics Co.,* 665 F.2d 305, 308 (10th Cir. 1981); *Heath* v. *Playboy Enterprises, Inc.,* 732 F. Supp. 1145, 1149 n.9 (S.D. Fla. 1990); *Doe* v. *Sarasota-Bradenton Fla. Television Co.,* 436 So. 2d 328, 331 (Fla. Dist. Ct. App. 1983).

giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. . . ."

See Prosser & Keeton, Torts § 117, at 860-861 (5th ed. 1984).

The parties dispute the propriety of deciding the question of newsworthiness on summary judgment. The issue has not been explicitly addressed in the Commonwealth. In *Jones* v. *Taibbi*, 400 Mass. at 801, the question whether the plaintiff's arrest was a matter of legitimate public concern was treated as one of law and decided on summary judgment. Decisions of other courts show a lack of agreement as to whether newsworthiness should in a given case be treated as a question of fact for the jury, see *Virgil* v. *Time, Inc.*, 527 F.2d 1122, 1130 & n.13 (9th Cir. 1975), cert. denied, 425 U.S. 998 (1976); *Veilleux* v. *National Bdcst. Co.*, 8 F. Supp. 2d 23, 38 (D. Me. 1998), a question of law for the judge, see *Cinel* v. *Connick*, 15 F.3d 1338, 1345-1346 (5th Cir.), cert. denied, 513 U.S. 868 (1994); *Walker* v. *Colorado Springs Sun, Inc.*, 188 Colo. 86, 101-102, cert. denied sub nom. *Wostendiek* v. *Walker*, 423 U.S. 1025 (1975) (libel action); *Barber* v. *Time, Inc.*, 348 Mo. 1199, 1206-1207 (1942), or a mixed question of fact and law, see *Winstead* v. *Sweeney*, 205 Mich. App. 664, 671-672 (1994). One factor supporting early disposition as a matter of law is the importance of constitutional interests in free speech and press that may be chilled if protracted litigation is allowed to be the norm rather than the exception — the same reason for which summary judgment is particularly favored in the defamation context. See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987), cert. denied, 485 U.S. 940, 962 (1988), and cases cited; *Cefalu* v. *Globe Newspaper Co.*, 8 Mass. App. Ct. at 74. This need may be strongest where the tort of public disclosure is concerned, because it involves concededly truthful rather than false publication. See *Romaine* v. *Kallinger*, 109 N.J. 282, 298 (1988). Thus, we reject the view that the legitimacy of public concern should always be treated as a question of fact, as that view eschews the well-recognized gatekeeper function of the judiciary in these cases. See *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 285 (1964). It is the role of the court to determine whether a jury question is presented, and here, where the standard is founded

on community mores, the question is whether reasonable minds could differ as to how the community would regard the publication at issue. See *Gilbert* v. *Medical Economics Co.*, 665 F.2d 305, 309 (10th Cir. 1981).

In our view, bearing in mind that the newsworthy category includes information that is of "genuine, even if more or less deplorable, popular appeal," Restatement (Second) of Torts § 652D comment g (1977), several factors combine so that reasonable minds would agree on the newsworthiness, even if only marginal, of the Herald article. First, Peckham himself was noteworthy both as a prominent real estate professional and as a recognized civic leader, and the circumstances of the paternity suit had a nexus to both of these roles in the community. See *Campbell* v. *Seabury Press*, 614 F.2d 395, 397 (5th Cir. 1980); *Gilbert* v. *Medical Economics Co.*, 665 F.2d at 308; Restatement (Second) of Torts § 652D comments e, f; Prosser & Keeton, Torts § 117, at 862 (5th ed. 1984). Second, the article touched on several topics that are issues of general modern public interest — a workplace liaison between an employee and her superior, the subsequent disavowal of paternity and layoff of the employee, and the possibility that a mother would be forced to seek public assistance because the putative father refused to give support. See *The Florida Star* v. *B.J.F.*, 491 U.S. at 536-537 ("the article generally, as opposed to the specific identity contained within it, involved a matter of paramount public import"). Third, the focus of the column was a judicial proceeding on a subject of inherent interest and concern to the public.[8] See *Cox Broadcasting Corp.* v. *Cohn*, 420 U.S. at 492-493; *Landmark Communications, Inc.* v. *Virginia*, 435 U.S. 829, 839 (1978); *Smith* v. *Daily Mail Publishing Co.*, 443 U.S. at 103; *The Florida Star* v. *B.J.F.*, 491 U.S. at 533; *Perry* v. *E. Anthony & Sons*, 353 Mass. 112, 114 (1967) (termination of libel suit matter of legitimate public concern); Restatement (Second) of Torts § 652D comments f, g.

The plaintiff urges that we treat G. L. c. 209C, § 13, as a dispositive legislative pronouncement that paternity proceedings are not matters of legitimate public concern. That statute, as in effect at the time of the publication of the article in question and as amended through St. 1996, c. 151, § 467, made docket

---

[8]The parties agree that the qualified privilege of "fair report," familiar in the defamation context, see *Sibley* v. *Holyoke Transcript-Telegram Publishing Co.*, 391 Mass. 468 (1984), is inapplicable to the plaintiff's primary claim.

entries and other court papers connected with paternity proceedings unavailable for public inspection unless ordered by a judge for good cause shown. (The statute was inverted in 1998: now such documents are available for inspection unless the judge for good cause shown orders otherwise, or if the defendant is adjudicated not to be the father. See St. 1998, c. 64, § 229.) The difficulty with this approach is the absence in the record of evidence that Nathan unlawfully accessed court records in preparing the news article.[9] The possibility of such illegality is not enough to get the plaintiff past a motion for summary judgment.

For the reasons set out herein, the trial judge correctly ordered the entry of judgment for the defendant Herald.

*Judgment affirmed.*

---

[9]Even if we were to assume — as we do not — that a faithless court employee divulged the record, it is by no means clear, in light of *The Florida Star* v. *B.J.F.*, 491 U.S. at 536, that a newspaper that did not participate in the illegality could be found liable for publishing the information. The rule seems to be that "[i]f a newspaper lawfully obtains truthful information about a matter of public significance then [the] state . . . may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Id.* at 533, quoting from *Smith* v. *Daily Mail Publishing Co.*, 443 U.S. at 103.

"To the extent sensitive information rests in private hands, the government may under some circumstances forbid its nonconsensual acquisition, thereby bringing [the publication of the information] outside of the *Daily Mail* principle . . . ." *The Florida Star* v. *B.J.F.*, 491 U.S. at 534. There is nothing to indicate that Nathan acquired her information "nonconsensual[ly]."