Cassie S. LEMIRE, Plaintiff,

v.

Joseph SILVA, Joan Silva, Russel Norton, The Sandwich School Department, The Town of Sandwich, Defendants.

No. Civ.A. 98–10056–REK.

United States District Court, D. Massachusetts.

June 21, 2000.

John T. Landry, Braintree, MA, Daniel W Rice, Boston, MA, for Cassie S. Lemire, plaintiff.

Leonard H. Kesten, Carol E. Kamm, Brody, Hardoon, Perkins & Kesten, Boston, MA, for Joseph Silva, Russel Norton, Sandwich School Department, Town of Sandwich, defendants.

Thomas G. Leonard, Jr., William P. Hurley, Cogavin & Waystack, Boston, MA, for Joan Silva, defendant.

## Opinion

KEETON, District Judge.

### I. Pending Matter

Pending for decision is Defendants' Motion for Summary Judgment (Docket No. 39, filed March 20, 2000), Defendants' Memorandum of Law in Support (Docket No. 40), Defendants' Statement of Undisputed Material Facts (Docket No. 41), and the Affidavit of Carol Kamm (Docket No. 42) (with Exhibits A–S).

Also before the court is Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Docket No. 47, filed April 28, 2000), Plaintiff's Memorandum in Support (Docket No. 48), and Plaintiff's Statement of Material Facts (Docket No. 49) (with Exhibits 1–38).

### II. Procedural Background

*1998–99.* The plaintiff filed her complaint on January 14, 1998 (Docket No. 1). Defendant Joan Silva answered the complaint on March 31, 1998 (Docket No. 9), and defendants Joseph Silva, Russell Norton, the Sandwich School Department, and the Town of Sandwich answered the complaint on April 2, 1998 (Docket Nos. 10, 11). On October 14, 1998, the parties agreed to submit the case to ADR (Docket No. 24), and this court referred the case to Judge Mazzone on January 12, 1999 (Docket No. 26). Judge Mazzone reported on May 25, 1999, that the parties had failed to reach a settlement (Docket No. 29), and returned the case to the undersigned judge for further proceedings.

*1999–2000.* The defendants Joseph Silva, Russell Norton, the Sandwich School Department, and the Town of Sandwich filed a motion for summary judgment on March 20, 2000 (Docket No. 39). On April 28, 2000, plaintiff filed its opposition to the defendants' summary judgment motion (Docket No. 47). The same defendants filed a reply to plaintiff's opposition on June 15, 2000 (Docket No. 55).

### III. Plaintiff's Claims and Defendants' Responses

First, plaintiff claims she was fired from her job as Sandwich High School Varsity Field Hockey Coach in May 1997 due to her mental impairment, in violation of the Americans with Disabilities Act, 42 U.S.C § 12101 et seq. (the "ADA"). She claims that the Sandwich School Department, the Town of Sandwich, Russell Norton, and Joseph Silva are jointly and severally liable for violation of the ADA. The defendants respond that no evidence of discrimination exists because plaintiff did not qualify as a disabled person under the terms of the ADA. They further respond that even if the plaintiff was disabled, they had a legitimate, non-discriminatory reason for terminating her employment. Defendants Russell Norton and Joseph Silva also seek dismissal of the ADA claims against them on the ground that individuals cannot be held liable under the ADA.

Second, plaintiff claims her dismissal also violated the analogous state disability discrimination statute, M.G.L. c. 151B. She claims that the Sandwich School Department, the Town of Sandwich, Russell Norton, and Joseph Silva are jointly and severally liable for violation of M.G.L. c. 151B. The defendants respond that no evidence of discrimination exists because plaintiff did not qualify as a disabled person under the terms of M.G.L. c. 151B. They further respond that even if the plaintiff was disabled, they had a legitimate, non-discrimi-

natory reason for terminating her employment.

Third, the plaintiff claims that Joan and Joseph Silva violated her privacy under M.G.L. c. 214 § 1B by disclosing her mental impairment and medical treatment in a flyer that was distributed after a field hockey match. The defendants respond that no evidence exists that either Mr. or Mrs. Silva had any involvement in the disclosure, and that even if such evidence did exist, the disclosure was neither unreasonable nor as serious or substantial as is required to support relief under the Massachusetts statute. Mr. Silva further responds that plaintiff relinquished her right to privacy regarding her medical condition by disclosing that information to him in 1992.

Fourth, plaintiff claims that Joan and Joseph Silva intentionally, and in the alternative recklessly, inflicted mental distress by disclosing her mental impairment and medical treatment. The defendants again respond that no evidence exists that either Mr. or Mrs. Silva had any involvement in the disclosure, and that even if such evidence did exist, the alleged conduct was not as extreme and outrageous as is required for relief under the common law, and no evidence exists that plaintiff suffered severe emotional distress as a result of the disclosure.

Fifth, plaintiff claims that the Sandwich School Department broke its employment contract with her and that she suffered harm as a result. Defendant responds that it had no contract with the plaintiff, and that even if a contract had existed, no breach occurred because sufficient justification to terminate her employment existed.

Sixth, plaintiff claims that Joseph Silva interfered with her advantageous business relationship with Sandwich High School by seeking her removal as field hockey coach because of her mental impairment. Plaintiff claims to have suffered significant harm as a result. Defendant Silva responds that improper motive is required

for relief under the common law, and he had no improper motive in seeking plaintiff's removal.

## IV. Factual Background

### A. Plaintiff's Employment and Mental Impairment

Plaintiff Cassie Lemire, thirty-six years old and a mother of four, was employed part-time as a field hockey coach at Sandwich High School in Sandwich, Massachusetts from 1992 to 1996.

The plaintiff has suffered from a panic disorder with agoraphobia since the age of 20. Her disorder is manifested by a number of symptoms, including anxiety attacks, irritable bowel syndrome, sleep disorder, fright, fear of dying, fear of being alone, and a fear of going to public places, such as churches, malls, grocery stores, and restaurants. Plaintiff has sought psychological and psychiatric treatment for her condition from a number of professionals since 1987. She takes antidepressants, and was taking them during 1996 and 1997. Without medication, she would suffer constantly from the symptoms of her condition. Even with medication, she still suffers from these symptoms periodically.

Plaintiff's treating psychiatrist, Dr. Julius Treibergs, indicated in a report dated February 16, 2000, that the plaintiff's psychiatric disorder has inhibited her ability to travel in a car far away from her home, particularly at night; her ability to be in confined spaces, such as a car, mall or crowd, without an impending sense of doom; her ability to interact with people outside her family; and her ability to work outside of home (Docket No. 49, Exhibit 2).

The plaintiff informed Sandwich High School Principal Russell Norton of her psychiatric disorder and treatment in September 1994, after she had been assaulted by a parent at a field hockey game.

### B. Disclosure of Plaintiff's Mental Impairment and Treatment

In 1992, either Joan or Joseph Silva— the parents of Julie Silva, a player on

plaintiff's field hockey team—came into the possession of one of plaintiff's appointment cards for Psychology Associates, where plaintiff was receiving treatment. The parties dispute how the appointment card came into the Silvas' possession. The plaintiff claims that Joseph Silva stole the appointment card when he was doing electrical work in the plaintiff's home. The defendants claim that the plaintiff left the appointment card in Joan Silva's van and that Joan Silva found it there.

On September 15, 1995, several copies of a flyer were found on the field hockey field at Sandwich High School at the conclusion of a varsity field hockey game. The flyer contained a copy of the plaintiff's appointment card for Psychology Associates and the following message in block handwriting: "DO YOU THINK THIS PERSON SHOULD BE COACHING YOUR CHILD THIS IS NOT A STABLE PERSON." Joseph Silva was present at the game. That night, plaintiff spoke with her friend Joan Powell, who informed her that either Mrs. Silva or a Mrs. Carol Markham might have been responsible for the flyer. The parties dispute whether Joseph Silva, Joan Silva, and their daughter Julie were responsible for the flyer. The plaintiff claims that Joan Silva wrote the block-letter words on the flyer and that either Joseph Silva or his daughter distributed the flyer. The defendants deny that the Silvas were involved with the flyer in any way.

## C. Plaintiff's Dismissal as Coach

During the 1996 field hockey season, plaintiff informed her team that she would probably not be returning as coach in 1997, because she would be relocating out of state due to her husband's anticipated job change. When this information came to the attention of Principal Norton, he posted the varsity field hockey coach position in the main office at Sandwich High School. When plaintiff learned of the posting, she informed Athletic Director Woodbury in writing that she would not be relocating and that she wanted to return as field hockey coach. According to the plaintiff's testimony, Woodbury then informed her that the job was hers.

In January 1997, Terrence O'Connell, whose two daughters played on the varsity field hockey team, met with Principal Norton and complained about the amount of playing time the plaintiff had given his daughters, as well as the plaintiff's involvement in her players' personal lives. Joseph Silva also met with Principal Norton and Athletic Director Woodbury. The parties disagree about the substance of Mr. Silva's conversation with them. The defendants claim that Mr. Silva voiced similar concerns to those of Mr. O'Connell. The plaintiff claims that Mr. Silva stated that he believed the plaintiff to be unstable and unsuited to coach because of her panic disorder.

In early March 1997, Principal Norton decided to institute a formal application process for the position of varsity field hockey coach. Athletic Director Woodbury informed the plaintiff that she would have to apply for her position and that her application would be considered by a Search Committee. The plaintiff claims that she was the only incumbent coach ever required to go before a Search Committee. On March 26, 1997, Norton advertised the position in the local newspaper, and in April or May he formed a five-member Search Committee including himself, Athletic Director Woodbury, and Joseph Silva, as well as two others. The parties dispute how Mr. Silva was selected for the Search Committee. The defendants claim that Mr. Silva's name was drawn from a hat. The plaintiff claims that Mr. Silva was appointed by Principal Norton.

The plaintiff applied for the field hockey coach position and the Search Committee—voting 3 to 1, with Mr. Silva opposed and Mr. Norton abstaining—selected her for the job over another applicant. Mr. Norton then called Sandwich Superintendent of Schools Peter Cannone to inform

him of the Search Committee's decision. The plaintiff claims that Norton recommended her for the job and that Superintendent Cannone approved the recommendation. The defendants claim that Norton merely informed Cannone that he was thinking of recommending the plaintiff.

On May 8, 1997, Norton and Woodbury met with the plaintiff. According to the plaintiff's testimony, they informed her that she had been selected, welcomed her back as coach, and gave her a performance review for the 1996 season and a letter setting out their expectations of her for the coming season.

Several days later, Terrence O'Connell brought a petition and several letters protesting plaintiff's appointment as field hockey coach to Superintendent Cannone. The plaintiff claims that Joseph Silva was the instigator of the petition. The defendant's deny that Mr. Silva had any involvement. Superintendent Cannone forwarded the petition and letters to Principal Norton. The plaintiff claims that Norton decided to fire her upon reviewing the petition and letters. The defendants deny this.

Principal Norton informed the plaintiff about the petition, but he refused to allow her either to see it or to respond. Norton informed the plaintiff that he would appoint an independent counselor to meet with the field hockey players and that he would decide whether to allow plaintiff to remain as field hockey coach after receiving the counselor's report. The plaintiff claims that Norton's appointment of the independent counselor was a pretext to cover up his earlier decision to fire her. The defendants deny this assertion.

On May 19, 1997, the independent counselor, Teresa Warren, met with the field hockey team. On May 27, 1997, Mrs. Warren issued a written report to Mr. Norton. According to the report, the students acknowledged the plaintiff's technical expertness and knowledge of the game, but felt demoralized by her treatment of them and also felt that her behavior on the team was unprofessional and inappropriate. Mrs. Warren concluded that the coach's treatment of the team had engendered an atmosphere of distrust.

The defendants claim that in addition to receiving Teresa Warren's written report of May 27, 1997, Norton also received an earlier oral report from Mrs. Warren on May 19, 1997. The defendants admit that Norton may not have waited to make his decision until he received the written report, but they claim that if he made his decision before May 27, 1997, the decision was based on Mrs. Warren's oral report of May 19, 1997. The plaintiff denies that Mrs. Warren made an oral report to Norton, and claims that Norton fired plaintiff and told her never to reapply on May 22, 1997, five days before Mrs. Warren's written report was issued.

## V. Summary Judgment Standard

Summary judgment should be granted only where the court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine dispute of material fact exists. *See* Fed. R.Civ.P. 56. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Then the non-moving party must demonstrate that *"every essential element* of its claim or defense is at least trialworthy." *Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir.1991) (italics in original). A dispute is genuine if it "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997). A fact is material if it "has the capacity to sway the outcome of the litigation under the applicable law." *Id.*

## VI. Applying the Law of Summary Judgment

### A. Americans with Disabilities Act

██ To prevail on a claim of unlawful discrimination under the ADA, the plaintiff

must prove by a preponderance of the evidence that (1) she was disabled within the meaning of the Act, (2) she was a qualified individual able to perform the essential functions of the job, with or without reasonable accommodation, and (3) the employer discharged her because of her disability. *See Criado v. IBM Corp.*, 145 F.3d 437, 441 (1st Cir.1998); *accord Zenaida Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 645–47, (1st Cir.2000).

## 1. Whether Plaintiff was Disabled Within the Meaning of the Act.

The ADA defines disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such impairment.

42 U.S.C. § 12102(2). The defendant has admitted, for purposes of summary judgment, that the plaintiff suffers from a mental impairment within the meaning of the ADA. The defendant argues, however, that plaintiff's impairment fails to limit substantially any of her major life activities. The plaintiff claims in response that her mental impairment has substantially limited four major life activities: working, interacting with others, traveling, and concentrating. Following the Supreme Court's approach in *Bragdon v. Abbott*, I will consider whether any of these is a major life activity under the ADA, and, if so, whether the activity is substantially limited by the plaintiff's mental impairment. *See Bragdon v. Abbott*, 524 U.S. 624, 637–642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

### (a) Whether Any Major Life Activity is Implicated

Working is undoubtedly a major life activity under the ADA. The EEOC has defined it as such in its implementing regulations. *See* 29 C.F.R. § 1630.2(i) (1999). Furthermore, the Supreme Court has held that the ADA must be construed to be consistent with these regulations. *See Bragdon*, 524 U.S. at 638, 118 S.Ct. 2196.

Interacting with others, traveling and concentrating are not included in the list of major life activities in the EEOC's implementing regulations. *See* 29 C.F.R. § 1630.2(i). In addition to working, the EEOC defines "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, [and] learning" as major life activities. *Id.* This list is illustrative, however, not exhaustive. *See Bragdon*, 524 U.S. at 638, 118 S.Ct. 2196. In *Bragdon*, the Court held that "the touchstone for determining the activity's inclusion under the statutory rubric is its significance," and that reproduction is a major life activity because it cannot "be regarded as any less important than working and learning." *Id.* In addition to being significant, a major life activity must also be "a basic activity that the average person in the general population can perform with little or no difficulty." *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999); *See also McAlindin v. County of San Diego*, 192 F.3d 1226, 1233 (9th Cir.1999).

In applying these two criteria, the court must be vigilant that the plaintiff is not "tailoring the definition of the life activity to fit the circumstances of his impairment." *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 152 (2nd Cir. 1998). By narrowing the scope of the life activity, the plaintiff can lessen her burden of showing a substantial limitation on that activity. *See id.* In *Johnson Controls*, the plaintiff hypothesized "everyday mobility" as a major life activity and defined it by describing his symptoms, such as the inability to travel over bridges or through tunnels. *Id.* The court held that such a narrowly defined life activity is not major, but suggested that mobility more broadly defined, such as the ability to leave one's house or travel to work, would be a major life activity. *Id.*

### (i) The Ability to Interact with Others

The ability to interact with others, if defined broadly to include the most basic

types of human interactions, is a major life activity. Human beings are fundamentally social beings. The ability to interact with others is an inherent part of what it means to be human. Even if we had the capacity to live without any human interaction, that capacity is immaterial in view of the highly interactive society in which we live. The ability to interact is thus both fundamental in itself and also essential to contemporary life. Beyond doubt, the ability to interact is at least as basic and as significant as the ability to learn or to work. The Court of Appeals for the Ninth Circuit recently held, in a case involving a plaintiff suffering from panic disorders, that interacting with others is a major life activity under the ADA. *See McAlindin*, 192 F.3d at 1234–35.

### (ii) The Ability to Travel/Basic Mobility

The ability to travel is also a major life activity, if defined, as the Court of Appeals for the Second Circuit suggested in *Johnson Controls*, to include basic mobility, such as leaving one's home. The ability to leave one's home and travel short distances is necessary in most cases to form and maintain social ties, earn a living, and purchase food and clothing. It is thus also at least as significant and as basic as learning and working. The EEOC implementing regulations list "walking" as a major life activity, which fact supports the conclusion that basic mobility is a major life activity. *See* 29 C.F.R. § 1630.2(i).

### (iii) The Ability to Concentrate

The ability to concentrate is not a major life activity. It is exceedingly difficult to define the ability to concentrate with sufficient specificity to avoid the tailoring problem noted in *Johnson Controls*. *See Johnson Controls*, 140 F.3d at 152. In addition, limitations on the ability to concentrate can be more appropriately framed as limitations on the major life activities of working, learning, or speaking. As the Court of Appeals for the Tenth Circuit held in *Pack v. Kmart Corp.*, "[c]oncentration may

be a significant and necessary component of a major life activity, such as working, learning or speaking, but it is not an activity itself." *Pack*, 166 F.3d at 1305.

### (b) Whether Plaintiff's Mental Impairment Substantially Limits a Major Life Activity.

 The evidence proffered by plaintiff demonstrates a genuine issue of material fact as to whether Mrs. Lemire was substantially limited in her ability to work, interact with others, and travel. The EEOC defines "substantially limits" as

"unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity."

29 C.F.R. § 1630.2(j)(1). In determining whether the plaintiff is substantially limited in a major life activity, a court must consider three factors: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long-term impact of or resulting from the impairment. *See Id.* The court must take into account, also, the mitigating measures the plaintiff employs, such as medication. *See Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999).

### (i) The Ability to Work

In order to demonstrate that her ability to work is substantially limited, plaintiff must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average individual having comparable training, skills, and abilities. The inability to perform a single, particular job does not con-

stitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3).

The plaintiff has proffered sufficient evidence to raise a genuine dispute of material fact as to whether she was substantially limited in her ability to work. Plaintiff testified in her deposition that she had to quit a security job in 1996 after four months of employment because she experienced several panic attacks while at work (Docket No. 49, Exhibit 1 at 43–46). Plaintiff claims that her fear of experiencing similar attacks at a place of employment away from home has precluded her from making any other attempts at such employment. Her treating psychiatrist, Dr. Julius Treibergs, has stated that her psychiatric disorder impairs her ability to work outside the home, to interact with people outside her family, and to travel far away from home (Docket No. 49, Exhibit 5). A jury could infer from this evidence, if credited, that the plaintiff's mental impairment forecloses her from a sufficiently broad range of jobs to limit substantially her ability to work.

### (ii) The Ability to Interact with Others

In *McAlindin*, the court held that

[r]ecognizing interacting with others as a major life activity of course does not mean that any cantankerous person will be deemed substantially limited in a major life activity. Mere trouble getting along with coworkers is not sufficient to show a substantial limitation … We hold that a plaintiff must show that his "relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary."

*McAlindin*, 192 F.3d at 1235 (quoting EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities 5 (March 25, 1997)). According to Ms. Lemire's treating psychiatrist, Dr. Julius Treibergs, her ability to relate with those living with her (her husband and her children) has had and will continue to have a good prognosis. Her ability to interact with others in crowded places, however, has and will continue to be impaired. A genuine dispute of material fact exists as to whether plaintiff's inability to interact with others in crowded places is a substantial limitation on her ability to interact with others.

### (iii) The Ability to Travel and Basic Mobility

According to Dr. Trieberg's February, 2000 report, Ms. Lemire's mental impairment interferes with traveling "far away from her home and being in confined spaces or crowds." Mrs. Lemire has testified that before her dismissal from her job, in May 1997, she was able on all occasions to travel short distances on her own to buy groceries, shop for clothes, go to the bank and to the post office, and do other errands (Docket No. 42, Exhibit A, Lemire Deposition, September 21, 1999, pp. 979–980). I conclude that no reasonable jury, presented with evidence like that now in the record before me, could find that at the time she was dismissed from her job Mrs. Lemire was substantially limited in her ability to travel, as defined by this court. *See infra* Part V(A)(1)(a)(ii).

### 2. Whether Plaintiff Was "Qualified"

Examination of an employee's "qualified" status requires consideration of whether the employee could perform the essential functions of the job and, if not, whether any reasonable accommodation by the employer would enable her to perform those functions. *See Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 33 (1st Cir.2000). The defendants argue that plaintiff's application for Social Security Disability Benefits precludes her from claiming that she was qualified to perform the essential functions of her job. The Supreme Court recently held that:

Pursuit, and receipt, of SSDI benefits does not automatically estop a recipient

from pursuing an ADA claim or construct a strong presumption against the recipient's ADA success. However, to survive a summary judgment motion, an ADA plaintiff cannot ignore her SSDI contention that she was too disabled to work, but must explain why that contention is consistent with her ADA claim that she can perform the essential functions of her job, at least with reasonable accommodation.

*Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 795–796, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). The plaintiff has provided a sufficient explanation for a jury to find that her SSDI claim is consistent with her ADA claim, and that she was able to perform the essential functions of her job at the time her employment was terminated.

Plaintiff filed for SSDI benefits on June 12, 1997, after her employment was terminated. In her application, she stated that she became unable to work because of her disabling condition on October 31, 1996. The defendants argue that if she was unable to work as of October 31, 1996, she could not have been able to fulfill the essential functions of her job when her employment was terminated in May 1997. The plaintiff explains that the date of October 31, 1996 has no significance in terms of her illness, but is only significant because it is the last day she in fact worked as a field hockey coach at Sandwich High School. She further explains that in putting that date on the SSDI form, she did not intend to assert that she could not perform the essential functions of the job of field hockey coach as of that date.

In addition, plaintiff explains that she filed her SSDI application in June 1997 because of the increased trauma caused by the termination of her employment. This is borne out by the SSDI application itself. On August 29, 1997, Dr. Brian O'Sullivan conducted a "Medical Residual Functional Capacity Assessment" of the plaintiff on behalf of the Social Security Administration. With regard to the plaintiff's loss of her coaching job, Dr. O'Sullivan concluded:

> The combination of anxious and paranoid limits in ability to tolerate close or crowded quarters, in ability to drive self, in ability to take criticism or avoid friction without developing fearful obsessions are such that ... regular routine would be too frequently disrupted to allow follow through of a regular or full time schedule until some closure or successful treatment occurs to allow claimant to recover from loss of a job unusually if not uniquely well tailored to her previous severe limits.

Docket No. 49, Exhibit 6. On the same day, Dr. O'Sullivan also was in contact with Dr. Julius Treibergs, the plaintiff's treating psychiatrist, and made the following report regarding the plaintiff:

> Claimant functioned in her part-time job for years despite considerable panic and anxiety symptoms. She is strongly identified with coaching as something she is confident she can do. This was despite a persistent ability to develop rather paranoid ideas that ... minor incidents could be part of deliberate attempts by others to bother her. The extreme trauma of the manner of her job ending ... has been associated with significant worsening ... She is significantly worse in functioning since this job loss and rather restricted by area of limited work confidence in seeing self as coach, as opposed to adjusting to a new area of work.

*Id.* Plaintiff was awarded Social Security disability benefits on September 10, 1997, after these reports had become part of the record of her application. The plaintiff's explanations and a review of her entire SSDI application would warrant a reasonable juror in finding that no inconsistency exists between the plaintiff's SSDI and ADA claims, and that she was able to perform the essential functions of her coaching job at the time her employment was terminated.

### 3. Whether Plaintiff was Discharged Because of Her Disability

#### (a) Introduction

The plaintiff can prove she was discharged because of her disability either by proffering direct evidence, or if direct evidence is lacking, through a three-stage order of proof articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Dichner v. Liberty Travel*, 141 F.3d 24 (1st Cir.1998). The plaintiff must first establish a prima facie case of discrimination by showing that "she is a member of a protected group who has been denied an employment opportunity for which she was otherwise qualified." *Dichner*, 141 F.3d at 29–30. This showing gives rise to an inference that the employer discriminated due to the plaintiff's disability. *Id.* The burden then shifts to the employer to demonstrate a legitimate, nondiscriminatory reason for discharging the employee. *Id.* If the employer can do so, the special benefit of the first showing disappears and the plaintiff must show that the employer's proffered non-discriminatory reason is a pretext. *Id.*

In *Dichner*, the First Circuit held that the plaintiff must show not only that the defendant's proffered reason is a pretext but also that the pretext was intended to cover up the proscribed type of discrimination. *Id.* This "pretext plus" interpretation of *McDonnell Douglas*, however, has been materially altered by the Supreme Court. *See Reeves v. Sanderson Plumbing Products, Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2107–09, 147 L.Ed.2d 105 (2000). In *Sanderson*, the Supreme Court established clear guideposts for determining whether a case should be allowed to go to the jury on indirect evidence.

> In entertaining a motion of judgment as a matter of law, the court should review all of the evidence in the record. In doing so, the court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence ... it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Id.* at 2110.

> The ultimate question is whether the employer intentionally discriminated ... "it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."

*Id.* at 2108 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

> In reaching this conclusion, however, we have reasoned that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.

*Id.* at 2108.

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.... In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."

*Id.* (quoting *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)).

> Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

*Id.* at 2108–09

> Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification

is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.*

This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.... Whether a judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.* at 2109.

For purposes of this case we need not— and could not—resolve all of the circumstances in which such factors would entitle an employer to judgment as a matter of law. It suffices to say that, because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination.

*Id.* at 2109. Although the claim of discrimination in *Sanderson* involved the ADEA, the Court's holding applies to the use of the *McDonnell Douglas* burden-shifting framework in Title VII and ADA cases as well. *See id.* at 2104–2106.

**(b) Direct Evidence of Discrimination**

Plaintiff has failed to proffer sufficient direct evidence to raise a genuine issue of material fact as to whether she was fired because of her disability. Plaintiff first claims that admissions made by Joseph Silva to third persons are direct evidence of discrimination. Amy Orrico states in her affidavit that Joseph Silva told her (1) that he believed the plaintiff was unsuitable as a field hockey coach because of her panic disorder; (2) that he therefore convinced the girls on the field hockey team to

circulate the petition urging that plaintiff be fired, and (3) that he also met with the High School Principal, Russell Norton, and told him that the plaintiff should be fired (Docket No. 49, Exhibit 11). Lee Reis states in her affidavit that Joseph Silva told her that plaintiff had been fired because she was seeing a psychiatrist (Docket No. 49, Exhibit 17). This evidence of admissions, if credited, is direct evidence of Mr. Silva's discriminatory intent, but it is only indirect evidence that plaintiff was fired because of her disability, as the terms "direct" and "indirect" are used in this context.

In considering this issue, a court must be sensitive to the particular meaning of "direct" and "indirect" as used in this context, rather than invoking a different meaning applicable in some other context.

The plaintiff claims that Russell Norton's appointment of Mr. Silva to the Search Committee is further direct evidence of discrimination, because Norton knew about Mr. Silva's discriminatory views about the plaintiff. Even if the court accepts plaintiff's assertion that Norton appointed Mr. Silva to the Search Committee, this is not direct evidence that Norton fired plaintiff because of her mental impairment.

**(c) Indirect Evidence of Discrimination**

■ Although direct evidence is insufficient, ample indirect evidence of discrimination has been proffered to support the plaintiff's opposition to summary judgment. The plaintiff has presented a prima facie case of discrimination. She has proffered sufficient evidence to create a genuine issue of material fact as to whether she was disabled and as to whether she was qualified to perform the essential functions of her job. *See infra* Part V(A)(1–2). The burden thus shifts to the defendants to demonstrate a legitimate, non-discriminatory reason for firing plaintiff. *See Dichner,* 141 F.3d at 29–30.

The defendants claim that they dismissed plaintiff because of Mrs. Warren's independent report. In those circumstances, the plaintiff needs to show that a reasonable jury could infer from the proffered evidence of record that defendants' stated reason is a mere pretext. *See Sanderson* at 2107–09.

I conclude that the plaintiff has proffered sufficient evidence to warrant a reasonable jury in finding pretext. The testimony of Amy Orrico and Lee Reis is indirect evidence that the real reason for plaintiff's dismissal was her mental impairment. The defendants' failure to inform plaintiff of the reason for her dismissal at the time is further indirect evidence that the real reason was discrimination. Finally, inconsistencies among defendants' contentions about when and on what basis Principal Norton decided to fire plaintiff are further indirect evidence of pretext.

**4. Liability of Individual Defendants Under the ADA**

■ The defendants seek dismissal of the ADA claims against Russell Norton and Joseph Silva on the ground that individual defendants cannot be held liable under the ADA. Neither the Supreme Court nor the Court of Appeals for the First Circuit has addressed this issue. Judge Ponsor of the U.S. District Court for the District of Massachusetts has held that the ADA forbids individual liability. *See Meara v. Bennett,* 27 F.Supp.2d 288, 290 (D.Mass.1998); *but see Ruffino v. State Street Bank and Trust Co.,* 908 F.Supp. 1019, 1047 (D.Mass.1995) (holding that individuals may be held liable under Title VII). Judge Ponsor's position is in accord with that of the three Circuit Courts of Appeals that have ruled on the issue. *See Butler v. City of Prairie Village, Kansas,* 172 F.3d 736, 744 (10th Cir. 1999); *Mason v. Stallings,* 82 F.3d 1007, 1009 (11th Cir.1996); *U.S. EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1279–82 (7th Cir.1995). Within the First Circuit, Judge Acosta of the United States District Court in Puerto Rico has also found no individual liability under the ADA. *See Figueroa v. Fajardo,* 1 F.Supp.2d 117, 120 (D.P.R.1998).

The ADA forbids discrimination by any "covered entity," defined as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. §§ 12112(a); 12111(2). "Employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees ... and any agent of such person." 42 U.S.C. § 12111(5)(A). The inference is strong that Congress (and the President in signing rather than exercising a veto) included the reference to "any agent of such person" to ensure employer liability, and reject individual liability. *See AIC Security,* 55 F.3d at 1281.

For these reasons, I will dismiss the ADA claims against Russell Norton and Joseph Silva.

**B. Massachusetts Discrimination Claim under M.G.L. c. 151B**

The plaintiff's burden under M.G.L. c. 151B is quite similar to her burden under the ADA. *See Dichner,* 141 F.3d. at 30. *See also Blare v. Husky Injection Molding Sys.,* 419 Mass. 437, 646 N.E.2d 111, 114–117 (1995). Massachusetts follows a "pretext only" approach similar to that invoked by the Supreme Court in *Sanderson. See Blare* at 117; *Sanderson* at 2107–09. The plaintiff has proffered sufficient evidence to raise genuine disputes of material fact with regard to her claim under M.G.L. c. 151B.

■ In contrast with ADA guideposts, the guideposts under M.G.L. c. 151B support liability of individuals. Federal district court decisions within the District of Massachusetts have supported individual liability under M.G.L. c. 151B. *See Meara,* 27 F.Supp.2d at 291; *Morehouse v. Berkshire Gas Co.,* 989 F.Supp. 54, 61 (D.Mass. 1997); *Ruffino,* 908 F.Supp. at 1047–48 (D.Mass.1995). State courts have done so

too. *See e.g., Winsmann v. Choate Health Management, Inc.,* No. CIV.A. 97–6561, 1998 WL 282901 (Mass.Sup. May 29, 1998). The claims against Russell Norton and Joseph Silva under M.G.L. c. 151B will not be dismissed.

## C. Massachusetts Right of Privacy Claim Under M.G.L. c. 214 § 1B

The Massachusetts right of privacy statute, M.G.L. c. 214 § 1B, provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." The invasion must be both unreasonable and either serious or substantial. *See French v. United Parcel Service, Inc.,* 2 F.Supp.2d 128, 130–131 (D.Mass.1998); *see also Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 409 Mass. 514, 567 N.E.2d 912, 914 (1991).

The plaintiff claims that Mr. Silva stole her appointment card for Psychology Associates and that he and Mrs. Silva produced and distributed the flyer containing copies of the appointment card. The plaintiff also claims that Mr. Silva informed parents and players about plaintiff's medical condition on other occasions.

■ The first question is whether Mrs. Lemire had a reasonable expectation of privacy with regard to the information disseminated in the flyer and allegedly disseminated by Mr. Silva on other occasions. *See Schlesinger,* 567 N.E.2d at 915; *see also Peckham v. Boston Herald, Inc.,* 48 Mass.App.Ct. 282, 719 N.E.2d 888, 891 (1999). Without doubt, a persons's medical condition and treatment are private facts protected by M.G.L. c. 214 1B. They are "highly personal or intimate in nature." *Bratt v. International Business Machines Corp.* 392 Mass. 508, 467 N.E.2d 126, 133–134 (1984). In *Bratt,* the court recognized "a patient's valid interest in preserving the confidentiality of medical facts relayed to a physician." *Id.* In *Tower v. Hirschhorn,* the court held that a physician's disclosure without the consent of the patient of confidential medical infor-

mation to two individuals would be sufficient to warrant a finding of invasion of privacy. 397 Mass. 581, 492 N.E.2d 728, 732 (1986).

The defendant further argues that neither *Hirschhorn* nor *Bratt* applies to the present case because they involve the special relationship that exists between a physician and a patient. As a matter of law, however, it is not necessary that the disclosing party be a physician. As long as the plaintiff has a reasonable expectation of privacy, an unreasonable and serious or substantial invasion of that expectation by anyone is a violation of the statute.

The defendant argues that the plaintiff had no reasonable expectation of privacy because she herself disclosed her medical condition and treatment to the defendant. The plaintiff admits in her deposition that she told Mr. Silva in the fall of 1992 that she suffered from panic disorders and anxieties, and was being treated with medication. (Docket No. 42, pp. 223, 943–945). The question, therefore, is whether the plaintiff relinquished her expectation of privacy in disclosing her medical condition and treatment to Mr. Silva.

In *Peckham,* the Massachusetts Court of Appeals considered "the extent to which one forfeits the privacy of personal facts by discussing them with one's close friends and family." 719 N.E.2d at 891. The court concluded that "[w]here one discusses sensitive personal matters with a close relative or trusted friend, one can often legitimately expect that these matters will remain confidential." *Id.* The court further held that it is a question of fact whether a person has relinquished his or her expectation of privacy. *Id.* The information proffered by the plaintiff, taken in the light most favorable to her, raises a genuine issue of material fact as to whether she had a reasonable expectation of privacy despite her disclosure to Mr. Silva.

The second question is whether the alleged invasion of privacy was unreasonable and serious or substantial. The plaintiff's

proffered evidence regarding Mr. Silva's distribution of the flyer and Mr. Silva's disclosures on other occasions, if credited, would warrant a jury in finding an unreasonable and serious or substantial invasion of plaintiff's statutory right to privacy.

## D. Intentional and or Reckless Infliction of Mental Distress

■ To support a claim for intentional infliction of emotional distress, plaintiff must establish the following four elements: (1) "that the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct;" (2) "that the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community;" (3) that the actions of the defendant were a cause of the plaintiff's distress; and (4) "that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure." *Thorpe v. Mutual of Omaha Insurance Company*, 984 F.2d 541, 545 (1st Cir.1993) (quoting *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315, 318–319 (1976)). Liability cannot be premised on "mere insults, threats or petty oppression." *Doe v. Town of Plymouth*, 825 F.Supp. 1102, 1111 (D.Mass.1993) (citing *Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72, 81 (1987)).

■ The evidence proffered by the plaintiff is sufficient to establish a genuine issue of material fact as to all four prongs of this claim. A jury would be warranted in finding that Mr. Silva was involved in distributing the flyer, and that he intended, knew, or should have known that it would cause the plaintiff emotional distress. The defendant argues that even if the plaintiff could satisfy her burden under the first prong, her claim fails because distribution of the flyer cannot be characterized as "extreme or outrageous" under the second prong, and because no evidence exists that the flyer was a cause of the

plaintiff's emotional distress, under prongs three and four. These arguments have no merit. A genuine dispute of material fact exists as to whether the distribution of the flyer was extreme and outrageous. The plaintiff's treating psychiatrist, Dr. Julius Treibergs, indicated in his report of February 16, 2000, that she reported a worsening of her symptoms after the flyer incident. A reasonable jury could find that the worsening of the plaintiff's symptoms was severe enough to warrant relief.

## E. Breach of Contract

The plaintiff claims that the Sandwich School Department entered into a contract with her in May 1997 for the 1997 field hockey season, and that the contract was broken when Principal Norton terminated her employment. The defendants claim that no contract existed because (1) a written contract had not been signed, and (2) the Superintendent had not given his approval. The defendants further argue that even if a contract existed, no breach occurred.

Under Massachusetts law, the school superintendent "may contract to employ athletic coaches for period not in excess of three years." M.G.L. c. 71 § 47A (1996). Massachusetts law further provides that a principal "shall be responsible ... subject to the approval of the superintendent, for hiring all teachers, instructional or administrative aides, and other personnel assigned to the school, and for terminating all such personnel, subject to review and prior approval of the superintendent ..." M.G.L. c. 71 § 59B (1996).

■ No requirement exists that a contract be put in writing in order for it to become valid. The statute of frauds does not apply in this case because the contract was to be performed within one year of its making. *See* M.G.L. c. 259 § 1. A genuine dispute of material fact exists as to whether Superintendent Cannone approved plaintiff's hiring in his conversation with Principal Norton. Also, although M.G.L.

c. 71 § 59B requires the previous approval of the superintendent in order to terminate an employment, the statute requires only approval, not previous approval, in order to hire an employee. If the Massachusetts legislature had intended to require previous approval of the superintendent, very likely they would have stated so explicitly in the statute, as they did in the case of terminating employees. I conclude that the statute permits a principal to hire persons and seek approval of the superintendent after the fact of hiring.

It is undisputed for purposes of summary judgment that Principal Norton informed the plaintiff that she had been selected as coach for the 1997 season, and that he had welcomed her back. A reasonable jury could infer that Principal Norton hired the plaintiff on May 8, 1997, and that a contract existed as of that date for the 1997 field hockey season.

 The plaintiff claims that the Sandwich School Department broke the contract when it fired her before the specified term of employment had expired. A reasonable jury could find from the evidence that the contract was indeed broken. If the jury determines that the contract was for a definite period of time and, therefore, that plaintiff was not an at will employee, she is entitled to damages resulting from the breach unless the employer can show that she was discharged for just cause. *See Klein v. President & Fel. Of Harvard Col.*, 25 Mass.App.Ct. 204, 517 N.E.2d 167 (1987); *Mahoney v. Hildreth & Rogers Company*, 332 Mass. 496, 125 N.E.2d 788, 790–91 (1955). "Just cause" has been defined as meaning "(1) a reasonable basis for employer dissatisfaction with a new employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business." *Klein*, 517 N.E.2d at 169. Plaintiff has proffered sufficient evidence

to warrant a reasonable jury in finding that no just cause existed.

## F. Interference with Advantageous Relationship

 To succeed in an action for intentional interference with an advantageous relationship, the plaintiff must prove: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and improper interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct. *See Laser Labs, Inc. v. ETL Testing Laboratories, Inc.*, 29 F.Supp.2d 21 (D.Mass.1998); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 23 (1990).

This tort is distinct from the tort of intentional interference with contractual relations. *See United Truck Leasing Corp.*, 551 N.E.2d at 22. Plaintiff appears to conflate the two in claiming intentional interference with an advantageous relationship, but drawing the legal standard from the tort of intentional interference with contractual relations.

Malicious interference is not required in a claim for interference with an advantageous relationship; improper interference is sufficient. *See id.* at 23. A defendant's liability may arise either from improper motives, or improper means. *See id.* Discrimination is an improper motive. *See Comey v. Hill*, 387 Mass. 11, 438 N.E.2d 811, 816 (1982) (holding that age discrimination is an improper motive); *See also United Truck*, 551 N.E.2d at 23.

 The defendant concedes for purposes of summary judgment that plaintiff had an advantageous relationship with the Sandwich School Department and that Mr. Silva was aware of that relationship. Genuine disputes of material fact exist, however, both as to whether Mr. Silva intentionally and improperly interfered with plaintiff's advantageous relationship, and as to whether plaintiff suffered a loss of

advantage directly resulting from that interference. Plaintiff has offered sufficient evidence to warrant a jury finding that Mr. Silva intentionally interfered with the plaintiff's advantageous business relationship by seeking her dismissal, and that his motive was discriminatory. Also, the plaintiff has proffered sufficient evidence to warrant a reasonable jury in finding that Mr. Silva's interference directly resulted in the plaintiff's dismissal as field hockey coach.

### Interlocutory Order

For the foregoing reasons, it is Ordered:

(1) Plaintiff's ADA claims against defendants Russell Norton and Joseph Silva individually are dismissed on the ground that individuals may not be held liable under the ADA.

(2) In all other respects, defendants' motions for summary judgment (Docket No. 39) are denied.

(3) The next Case Management Conference is set for 3 p.m. October 18, 2000.